Isadore BLAU, a stockholder of Air-Way Industries, Inc., suing on behalf of himself and all other stockholders similarly situated and on behalf and in the right of Air-Way Industries, Inc., Plaintiff-Appellee-Appellant,

v.

Edward LAMB and Edward Lamb Enterprises, Inc., Defendants-Appellants-Appellees.

No. 202, Docket 29940.

United States Court of Appeals Second Circuit.

Argued Dec. 17, 1965.

Decided June 27, 1966.

**512**

Morris J. Levy, New York City, for plaintiff-appellee-appellant.

Albert R. Connelly, Cravath, Swaine & Moore, Thomas A. Halleran, New York City, J. Eugene Farber, Toledo, Ohio, Robert Rosenman, John S. Gilbert, New York City, for defendants-appellants-appellees.

Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, Meyer Eisenberg, Special Counsel, Gus J. Bennett, Washington, D. C., Attorney, on brief for Securities and Exchange Commission, amicus curiæ.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

The plaintiff-appellee-appellant, Isadore Blau, a stockholder of Air-Way Industries, Inc. (Air-Way), a Delaware corporation, commenced this action pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p (b), to recover "short-swing" profits allegedly realized by the defendants-appellants-appellees, Edward Lamb (Lamb) and Edward Lamb Enterprises, Inc. (Enterprises), an Ohio corporation, as a result of their respective short-term dealings in the convertible preferred stock and common stock of Air-Way.[1] Jurisdiction and venue in the district court were proper under Section 27 of the Act, 15 U.S.C. § 78aa. Blau v. Lamb, 20 F.R.D. 411 (SDNY 1957). See 2 Loss, Securities Regulation 1044–45 (2d ed. 1961).

For reasons to be considered hereinafter the court below entered a final judgment on June 5, 1965, holding Lamb liable to Air-Way for "short-swing" profits amounting to $206,356.45 and Lamb and Enterprises jointly and severally liable to Air-Way for "short-swing" profits amounting to $1,091,063.31. Blau v. Lamb, 242 F.Supp. 151 (SDNY 1965). Lamb and Enterprises have appealed on the ground that the transactions in which they engaged did not involve "purchases" or "sales" or, in any event, that the transactions did not result in any "profit realized" within the meanings of those three terms as the terms are used in Section 16(b) of the Act. They contend further that even if all the relevant transactions are within the scope of Section 16(b) the court below grossly overvalued the "profit realized." Blau has appealed on the grounds that the lower court undervalued the "profit realized," that certain cash dividends for which recovery was denied are recoverable, and that interest should have been added to the amount held recoverable. The Securities and Exchange Commission was granted permission to submit a brief, amicus curiæ, in order to express its views upon certain of the issues presented by the appeal of Lamb and Enterprises.

I. *The Factual Background.*

The present lawsuit arises out of a complicated series of transactions in the Convertible Preferred Stock and the com-

---

1. It has already been decided that Blau has sufficient indicia of ownership to bring this action. Blau v. Lamb, 314 F.2d 618 (2 Cir. 1963). On December 31, 1958, Air-Way changed its name to Lamb Industries. In this opinion we will refer to the parties as they were named in 1955.

mon stock of Air-Way, carried on by Enterprises and Lamb during 1955. We set forth this series of transactions chronologically before turning to consider the question of Section 16(b)'s application to any of them.

▇ In June of 1955 and throughout the relevant period Lamb was an officer and director of Air-Way. Enterprises, which was a personal holding company for Lamb interests solely owned by Lamb, members of his immediate family, and corporations controlled by them, was the beneficial owner of more ·than 10 per cent of the outstanding common stock of Air-Way.[2] Lamb, members of his family, and certain corporations controlled by them were sufficiently in control of Air-Way to have elected 5 of that company's 7 directors. At all relevant times the common stock of Air-Way was registered for trading on the American Stock Exchange and was actively traded. Also, Enterprises and Lamb, together with members of Lamb's family, owned approximately 97 per cent of the outstanding shares of Lamb Industries, Inc. (Industries), an Ohio corporation they completely controlled. None of Industries' shares were ever listed on a national securities exchange.

In June 1955 the "Lamb interests" decided to merge Industries into Air-Way. On June 6, shortly before the stock-for-stock merger was finally approved by the Air-Way Board, Industries transferred to Enterprises 68,100 shares of Air-Way Common, which Industries had apparently held for more than six months, plus other assets, aggregating $227,850. Industries received in exchange 40,002 shares of Industries (its own) Common Stock plus the assumption by Enterprises of a $581,250 note that Industries had given to a bank.

On June 9, 1955, the Air-Way Board approved an offer to the shareholders of Industries to exchange one share of new-

ly-created 5 per cent Cumulative Convertible Preferred Stock of Air-Way (Air-Way Preferred) for each five shares of Industries Common. The par value of the Air-Way Preferred was $50, it had a liquidation value of $52.50 plus accumulated dividends, and was convertible at any time into Air-Way Common at a ratio of 3½ shares of Air-Way Common for each share of Air-Way Preferred. In the event of any stock dividend, or split-up by reclassification, or by any other method, of the shares of Air-Way Common, the number of shares into which the shares of Air-Way Preferred were convertible would be appropriately adjusted. Each share of Air-Way Preferred carried a dividend of $2.50 a share per annum and was entitled to one vote.

From July through September 1955, in accordance with Air-Way's June 9 offer, Lamb exchanged 26,300 shares of Industries Common for 5,260 shares of Air-Way .Preferred, and Enterprises exchanged 172,945 shares of . Industries Common for 34,589 ·shares of Air-Way Preferred. On September 13, 1955 Enterprises converted its recently-acquired 34,589 shares of Air-Way Preferred into 121,061 shares of Air-Way Common. On September 13, 14, and 15, Lamb converted his recently-acquired 5,260 shares of Air-Way Preferred into 18,410 shares of Air-Way Common.[4]

On September 12, 1955 Air-Way declared a 100 per cent stock dividend on its Common, in the nature of a stock-split, payable on October 14, 1955, to stockholders of record on September 29, 1955. The conversions by Lamb and Enterprises occurred on September 13, 14, and 15, 1955, after the two-for-one stock dividend had been declared, and after the news of this declaration had been made public. On September 19, 1955, four days after the last conversion had occurred, Air-Way declared a cash dividend of 15 cents per share on its Common, pay-

---

**2.** Lamb and Enterprises were thus both "insiders" in their issuer, Air-Way; Lamb because he was a director, and Enter- prises because it was the beneficial owner of more than 10 per cent of Air-Way's stock. See note 6 infra.

able November 1, 1955, to stockholders of record on October 24, 1955.[3]

On October 6, 1955 Enterprises privately sold 10,500 shares of Air-Way Common as constituted prior to the stock split to Industries, on October 13, 1955 Enterprises privately sold 6,500 shares of new Air-Way Common—that is, Air-Way Common after the 100 per cent stock dividend in the nature of a stock split—to the Edward Lamb Foundation, Inc., a charitable foundation, created and controlled by Lamb.[4] Other sales by Enterprises during the relevant period are not at issue on appeal.[5]

Certain facts that do not conveniently fit the foregoing chronological review of the relevant transactions are nevertheless important and are best stated now. On June 30, 1955 Air-Way declared a 30¢ per share dividend on the Air-Way Common then outstanding. Throughout the period relevant to this litigation Lamb and Enterprises, on various occasions, purchased and sold blocks of Air-Way Common on the American Stock Exchange. Lamb purchased 300 shares of Air-Way Common between March 18 and March 22, another 100 shares on May 13, and 200 more shares between September 2 and September 8. On September 15, on the American Stock Exchange, he sold 300 shares of Air-Way Common, as constituted prior to the 100 per cent stock dividend. This was the only relevant transaction in which Lamb disposed of shares of Air-Way Common to a purchaser other than a corporation controlled by him. Lamb also purchased on a "when-issued" basis 100 shares of new Air-Way Common on October 6 on the American Stock Exchange. Between May 2, 1955 and December 28, 1956, Enterprises purchased 1,700 shares of old Air-Way Common and 5,200 shares of new Air-Way Common.

II. *Purpose and Scope of Section 16(b).*

Section 2 of the Securities Exchange Act of 1934, 15 U.S.C. § 78b, states that the Act was designed, *inter alia,* "to insure the maintenance of fair and honest markets" in securities transactions. Section 16(b) helps to implement this overriding purpose by making it unprofitable for "insiders"[6] to engage in short-swing speculation. "Prior to the enactment of the Securities Exchange Act," the SEC has said, "profits from 'sure thing' speculation in the stocks of their corporations were more or less generally accepted by the financial community as part of the emolument for serving as a corporate officer or director notwithstanding the flagrantly inequitable character of such trading." 10 SEC Ann.Rep. 50 (1944). Among the inequitable short-swing transactions that prompted the enactment of Section 16(b) were transactions in which insiders, with advance knowledge of information that would produce a rise in the market price of a stock of their company, bought stock at the then current market prices and sold it when publication of the information had

3. The regular quarterly dividend for the immediately preceding quarter was 30¢ per share. The 15¢ per share dividend declared on September 19, 1955 reflected the 2-for-1 split.

4. The Directors of the Edward Lamb Foundation were Lamb, Lamb's wife, and Lamb's secretary. Although the 100 per cent common stock dividend in the nature of a stock split was declared by the Air-Way Board on September 12, 1955, and was payable October 14 to stockholders of record as of September 29, and the sale by Enterprises to the Lamb Foundation occurred on October 13, both parties treat this sale as if it occurred on October 14 or thereafter and was of the new Air-Way Common.

5. The district court found, and Lamb and Enterprises do not dispute the validity of this finding, that certain of Enterprises' purchases and sales of Air-Way Common in 1956 resulted in an insider's profit of $589, recoverable for the benefit of Air-Way.

6. Section 16(a) states that an "insider" is any "person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security" of his issuer, "or who is a director or an officer of the issuer." 15 U.S.C. § 78p(a). Both Lamb and Enterprises were "insiders" in Air-Way. See note 2 supra.

caused the anticipated rise to occur. And, too, there were transactions in which insiders with advance knowledge of facts that would depress the market price sold their stock at the then current prices and purchased stock when publication of the facts had had the expected depressing effect. Also, on occasion, the desire to obtain such profits had even led insiders to manipulate the market price of their corporation's stock by causing their corporation to pursue financial policies calculated to produce sudden fluctuations in market prices.[7]

Section 16(b) was enacted to "bring these practices into disrepute and encourage the voluntary maintenance of proper fiduciary standards." H.R.Rep. No.1383, 73d Cong., 2d Sess. 13 (1934). The section provides that:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name of and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall

fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and the purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection. 15 U.S.C. § 78p (b).

■ Section 16(b), it should be emphasized, embodies a rather uncommon regulatory mechanism. The section's underlying purpose, as set forth in its preamble, is to prevent the "unfair use" of information by insiders. This purpose is effectuated by means of, what has been termed, a "crude rule of thumb."[8] In order to insure discouragement of unfair insider short term trading *all* inside trading within a less-than-six-month period is discouraged. The arbitrary, some might say Draconian, nature of this statute reflects the view of experts who testified at the hearings leading to the passage of the 1934 Act that the unfair use of information by corporate insiders could only be effectively curbed by a law that made it unprofitable for insiders to engage in any short-term trading, whether fair or unfair.[9] It might be said that Congress decided in order to throw out the bathwater that the baby had to go too. In order so to insure that Section 16(b) efficaciously put an end to unfair insider trading, Congress explicitly made irrelevant the intent of any insider who engages in a short-term transaction, and did not condition the section's application on proof of an insider's intent to trade on a short swing. The desire of Congress to prevent unfair insider trading, regardless of its form, is evident in

---

7. See S.Rep. No. 1455, 73d Cong., 2d Sess. 55–68 (1934); S.Rep. No. 792, 73d Cong., 2d Sess. 7–9 (1934); H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13–14 (1934).

8. Hearings Before Senate Committee on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934).

9. Ibid.

the act's inclusive definitions of several of the section's important terms. Section 3(a) (11) defines the term "equity security" to include "any security convertible, with or without consideration, into such a security * * * " [10] Section 3(a) (13) broadly defines "purchase" as including "any contract to buy, purchase, or otherwise acquire," [11] and "sale" is defined by Section 3(a) (14) as including "any contract to sell or otherwise dispose of." [12] A reasoned elaboration of Section 16(b)'s underlying purpose, plus the recognition that the section's success as a deterrent was rooted in its simplicity and relatively automatic operation, prompted our court to hold in an early case that proof of an actual unfair use of inside information was not required, saying that "the only remedy which its framers deemed effective for this reform was the imposition of a liability based upon an objective measure of proof." Smolowe v. Delendo Corp., 136 F.2d 231, 235, 148 A.L.R. 300 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). In order to insure that unfair use of information by insiders is prevented, courts have been equally quick to reject other arguably relevant considerations that would limit the broad reach and relatively automatic operation of that section. See 2 Loss, Securities Regulation, 1041–1042 (2d ed. 1961).

■■ It is equally important to emphasize that one issue is not finally resolved by the broad reach of Section 16 (b) and the considerable evidence that Congress intended the section to deter unfair insider trading by rendering unprofitable all insider trading within any less-than-six-month period. It is quite apparent that because of the broad definitions of "purchase" and "sale" imported into Section 16(b), this section may be applied not only to routine cash purchases and sales of equity securities but also may be applied to acquisitions and dispositions of equity securities in transactions involving conversions, options, stock warrants, reclassifications and the like. It is perhaps less apparent but nonetheless true that as a matter of fact some of these transactions may not lend themselves in any way to an unfair use of inside information by corporate insiders.[13] Granting that the theory of regulation underlying Section 16(b) requires the application of this section to every transaction that might possibly permit an insider to use inside information unfairly, the unresolved question is whether 16(b)'s regulatory mechanism also requires the application of the section to a conversion transaction such as that involved here, which could not possibly serve as a vehicle for any of the abuses at which Section 16(b) was aimed. Put more generally, the unresolved issue is whether this particular type of regulatory mechanism renders inapplicable a well-known rule of construction: *cessante ratione legis, cessat et ipsa lex.*

With the background of this far from comprehensive brief restatement of Section 16(b)'s underlying purpose and of the regulatory mechanism Congress chose to effectuate this purpose, we now examine the section's application to each of the transactions which the court below held resulted in the short-swing profits for Lamb and Enterprises that were recoverable by Air-Way.

III. *Application of Section 16(b).*

A. *The Purchase and Conversion of Air-Way Preferred by Lamb and Enterprises.*

The district court held, and on appeal Lamb and Enterprises do not contest the holding, that the exchange with Air-Way in the summer of 1955 of Industries Common for Air-Way Preferred con-

---

10. 15 U.S.C. § 78c(a) (11).

11. 15 U.S.C. § 78c(a) (13).

12. 15 U.S.C. § 78c(a) (14).

13. See, e. g., Blau v. Max Factor & Co., 342 F.2d 304 (9 Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965). See also Meeker & Cooney, The Problem of Definition in Determining Insider Liabilities Under Section 16(b), 45 Va.L.Rev. 949, 975 (1959).

stituted a Section 16(b) "purchase" by Lamb and Enterprises of the Air-Way Preferred. The district court also held that the September 1955 conversion of the Air-Way Preferred into Air-Way Common constituted a Section 16(b) "sale" of the Air-Way Preferred, and went on to conclude that Lamb and Enterprises had "realized" a profit of $1,-138,782.31 from this conversion, which was the difference between what it found to be the "cost" of the Air-Way Preferred (based upon its valuation of the Lamb Industries Common exchanged for the Air-Way Preferred) and the highest market price of the Air-Way Common on the relevant dates of conversion. Lamb and Enterprises maintain that this conversion did not constitute a "sale" resulting in any "profit realized" within the intendment of Section 16(b). Blau contends the district court's only error was in undervaluing the "profit realized" that resulted from the sale. For reasons given hereafter we reverse the district court and hold that the conversion of Air-Way Preferred into Air-Way Common was not a Section 16(b) "sale" by Lamb or Enterprises. Thus we do not reach the valuation issue raised by Blau.

The question to be decided is whether a conversion of preferred stock into common constitutes a Section 16(b) "sale" of the preferred. It is possible to resolve this question by holding that the broad reach of Section 16(b), the unambiguous legislative history stating that Congress intended the section to deter unfair insider trading by rendering unprofitable all "insider trading" within any less-than-six-month period, and early judicial declarations that the section embodies an "objective" test of insider liability,[14] require the unstinting application of this section to any exchange of shares that can be described as a "purchase" or a "sale." One can, as a matter of language, describe the conversion of a company's convertible preferred stock into an equivalent amount of common stock as a "dis-position" or "sale" of one equity security (the preferred) and an "acquisition" or "purchase" of another (the common). Thus it follows from this approach to the problem that, if the conversion can be paired with another "sale" or "purchase," and the paired transactions occur within a six month period, the paired transactions are, without further inquiry, the type of insider activity that Section 16 (b) was designed to prevent. A 1947 decision of our court, authored by Judge Clark, has become the model of this approach to the problem of the section's application. Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2 Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L. Ed. 347 (1947). In Park & Tilford the defendants held preferred and common representing a controlling interest in the company. In late 1943 and early 1944 the market price of the common rose significantly. The company served notice of redemption of its preferred stock on December 20, 1943. On January 19, 1944, the defendants converted their preferred into common and within six months they sold the common. Holding the defendants liable for insider profits, Judge Clark stated, 160 F.2d 987:

> We think a conversion of preferred into common stock followed by a sale within six months is a "purchase and sale" within the statutory language of § 16(b). Whatever doubt might otherwise exist as to whether a conversion is a "purchase" is dispelled by definition of "purchase" to include "any contract to buy, purchase, or otherwise acquire." § 3(a) (13). Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act.

This language certainly suggests that every conversion should be said to involve a Section 16(b) "purchase" of the common, subjecting the insider to liability if the conversion can be paired with a "sale" of common within a less-

---

14. See Section II supra.

than-six-month period and the paired transaction shows a profit to the insider. Several courts have read *Park & Tilford* as standing for precisely such a rule. E. g., Heli-Coil Corp. v. Webster, 352 F.2d 156 (3 Cir. 1965); Petteys v. Northwest Airlines, Inc., 246 F.Supp. 526 (D.Minn.1965); cf. Blau v. Hodgkinson, 100 F.Supp. 361 (SDNY 1951). Of course, *Park & Tilford* dealt specifically with whether a conversion should be considered a Section 16(b) "purchase" of the common. Recently, however, the Third Circuit has concluded that precisely the same approach required an affirmative answer to the question whether a conversion is a Section 16(b) "sale" of the preferred. Heli-Coil v. Webster, supra.

■ We do not agree that we should, without further inquiry, so resolve the question of whether a conversion of preferred stock into common constitutes a Section 16(b) "sale" of the preferred. Certainly we are not compelled to do so by any Second Circuit precedent. Aside from the intimations to the contrary in *Park & Tilford*, our court appears always to have recognized that in deciding whether a certain transaction is a Section 16(b) "purchase" or "sale" it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent. For example, in a 1954 case in this Circuit, insiders owning more than 45 per cent of their company's single class of common stock arranged for the company's stock to be reclassified into a new class of preferred and a new class of common in order to improve the marketability of their interest in the company. Within six months of the exchange incident to the reclassification the insiders sold the new securities at a profit. In an opinion authored by Judge Clark, our court held that the insiders' acquisition of the newly created common and preferred was not a "Section 16(b) purchase" of this stock. Roberts v. Eaton, 212 F.2d 82 (2 Cir.), cert. denied, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954). The court reasoned that the "cumulative effect" of several factors established that the "reclassification at bar could not possibly lend itself to the speculation encompassed by § 16(b). This being so, it was not a 'purchase' * * *." 212 F.2d at 86. See also Shaw v. Dreyfus, 172 F.2d 140 (2 Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949); Truncale v. Blumberg, 80 F.Supp. 387 (SDNY 1948). In 1960, Judge Medina, in a considered dictum, stated that he understood the rule to be that a "transaction is a 'purchase' if in any way it lends itself to the accomplishment of what the statute is designed to prevent." Blau v. Lehman, 286 F.2d 786, 792 (2 Cir. 1960), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). The view that Section 16(b)'s purpose can be fully accomplished without subjecting to 16(b) sanctions every transaction describable in its terms has also commended itself to other United States Courts of Appeals. In a case, like *Park & Tilford*, involving a conversion and subsequent sale of common, the Sixth Circuit held the conversion was not a Section 16(b) "purchase" of the common on the ground that, under the circumstances of that case, the conversion "was not one that could have lent itself to the practices which Section 16(b) was enacted to prevent." Ferraiolo v. Newman, 259 F.2d 342, 346 (6 Cir.1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed. 2d 629 (1959).[15] And the Ninth Circuit

---

15. In *Ferraiolo*, as in *Park & Tilford*, the issuer served notice of redemption of the preferred stock and thereafter the insider converted. The Sixth Circuit distinguished *Ferraiolo* from *Park & Tilford* on the ground that the insider did not control the issuer whereas in *Park & Tilford* the insider had a voting majority and thus absolute power to determine whether the preferred stock should be called for redemption. Insider control may indeed explain *Park & Tilford*. See 2 Loss, Securities Regulation 1067 (2d ed. 1961). But the absence of insider control is not a total explanation of *Ferraiolo*, *Ferraiolo* instead stands for the proposi-

recently adopted the same approach when faced with deciding whether an insider's conversion of one class of outstanding common into another class of outstanding common with different dividend attributes constituted a Section 16(b) "purchase" of the latter. Blau v. Max Factor & Co., 342 F.2d 304 (9 Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180 (1965).

■ Thus far we have only established that the decided cases in this and other circuits do not require us to hold that, without further analysis, the conversion of Air-Way Preferred into Air-Way Common must be regarded as a Section 16(b) "sale" of the Air-Way Preferred. Instead, most of the appellate decisions, including the more recent decisions of our court, state that the application of Section 16(b) depends upon whether the transaction in question could tend to accomplish what the section was designed to prevent. Contra, Heli-Coil Corp. v. Webster, supra. It is, of course, clear that this judicial limitation on the reach of Section 16(b) is perfectly consistent with the section's underlying purpose of preventing the unfair use of inside information by corporate insiders. This underlying purpose provides no reason for the application of Section 16(b) to a transaction that poses no danger whatever of insider abuse. Nevertheless, it is arguable that the regulatory mechanism chosen by Congress to effectuate Section 16(b)'s underlying purpose may have removed the power a court otherwise would have to hold that this legislative command should not apply to a transaction that could not possibly permit the mischief the legislature wished to remedy. The argument for such a position recognizes that in Section 16(b) Congress chose to effectuate the section's underlying purpose by making it unprofitable for insiders to engage in any trading at all within any less-than-six-month period and emphasizes that Congress contemplated that the section would be

applied to transactions that did not involve unfair insider trading. In other words, this argument is based upon the proposition that Congress by choosing to regulate in this fashion implicitly forbade the federal courts to have recourse to the maxim *cessante ratione legis, cessat et ipsa lex* as a tool of construction in close cases. We do not find this argument persuasive. To be sure, the theory of regulation underlying Section 16(b)'s regulatory mechanism provides a sufficient reason for refusing to examine the details of transactions once it has been determined that they might possibly have served as vehicles for unfair insider trading. But it does not supply an equally sufficient reason for applying Section 16(b) in this same automatic fashion when a substantial question is raised whether a certain conversion transaction permits a possibility of insider abuse. Congress adopted the sweeping, arbitrary regulatory mechanism embodied in Section 16(b) in order to insure that even the possibility of insider abuse was deterred, but it would seem to follow that in order to avoid "purposeless harshness" a court should first inquire whether a given transaction could possibly tend to accomplish the practices Section 16(b) was designed to prevent. Blau v. Max Factor & Co., supra, 342 F.2d at 307. Frequently this initial inquiry will convince a court that the transaction in question held out at least the possibility of abuse; in such cases Section 16(b)'s regulatory mechanism requires that the section be applied without further inquiry. In some cases, however, this initial inquiry will convince a court that the conversion transaction in question could not possibly have lent itself to insider abuse. In such a case it is not inconsistent with Section 16(b)'s regulatory mechanism to hold that the section does not apply.

One further point deserves brief notice. In Heli-Coil Corp. v. Webster, supra, a majority of the Third Circuit con-

tion that Section 16(b) need not be applied to every single transaction describable in its terms; that is, for the approach

to the section's application that we are adopting.

cluded that Congress intended Section 16(b) to be "entirely objective." 352 F.2d at 165. The limitation on Section 16(b)'s application we here adopt was there rejected on the ground that decision as to whether a certain transaction could possibly lend itself to the abuses Section 16(b) was designed to prevent "must be determined to some degree at least by the minds of the finders of fact," 352 F.2d at 164, and thus imported an impermissible "subjective" consideration into the task of applying the section. We consider this observation unobjectionable but point out that it is irrelevant. Of course, the inquiry whether a certain transaction lends itself to the accomplishment of what Section 16(b) is designed to prevent must be decided "by the minds of the finders of fact." This is true of the task of law application generally. There is no rule so "objective" ("automatic" would be a better word) that it does not require some mental effort in applying it on the part of the person or persons entrusted by law with its application.

We thus turn to consider whether the conversion of Air-Way Preferred into Air-Way Common in September 1955 by Lamb and Enterprises in any way lent itself to the accomplishment of what Section 16(b) was designed to prevent. The court below answered this question affirmatively. 242 F.Supp. at 157. It held that the conversion was a Section 16(b) "sale" of the Air-Way Preferred, which, when matched with the earlier "purchase" of the Preferred by Lamb and Enterprises, rendered Lamb and Enterprises liable for insider profits. The district court's decision appears to rest on two rather separate grounds. First, the court said that in view of the circumstances surrounding the purchase of the Air-Way Preferred and its subsequent conversion, "[i]t requires little imagination to infer * * * a corporate milieu

rife with opportunities for speculation and misuse of inside information." 242 F.Supp. at 157. Second, the court seems to have implicitly conceded that an insider's conversion of preferred into common should not be deemed a Section 16(b) "sale" if the common is economically equivalent to the preferred, but it went on to say that the "simple answer" to this contention in this case was that by converting the preferred Lamb and Enterprises "received a totally different security with an attendant alteration in the risks and advantages involved." 242 F.Supp. 157–158. We disagree with both grounds the district court advanced in support of its decision.

In support of its contention that the preferred stock transaction lent itself to the accomplishment of "speculation and misuse of insider information" the district court noted that Lamb controlled Air-Way and was the "guiding force" behind the merger of Industries into Air-Way; that the immediate purpose of the merger was to graft onto Air-Way a management team Lamb had previously recruited for Industries; that Air-Way's noncontrolling stockholders were not asked to approve the merger until that company's next annual meeting in March 1956; that the conversion of Air-Way Preferred by Lamb and Enterprises was "voluntary"; [16] and that by so converting Lamb was able to increase his holdings of Air-Way Common, consequently tightening his grip on that company. After enumerating these facts, without further analysis, the lower court concluded that the situation was "rife with opportunities for speculation and misuse of inside information." We have a substantial problem with this approach. The factors enumerated do serve to emphasize Lamb's control of Air-Way. He was in a position to direct the stock-for-stock merger at an exchange ratio apparently favorable to holders of Industries

16. By saying that the conversion in the present case was "voluntary" the court below intended to distinguish *Ferraiolo.* See note 15 supra. We agree that the conversion was "voluntary." But we do not attach determinative consequences to this conclusion.

Common [17] without the formal approval of all Air-Way shareholders expressed at an annual meeting,[18] and, when he converted, his position as a controlling insider became even more secure. As controlling insiders Lamb, and Enterprises, clearly had the power to misuse inside information for speculative purposes.[19] But the question remains: Did the conversion present Lamb or Enterprises with even the slightest opportunity to exercise that power? The facts enumerated by the district court, standing alone, fail to establish that the conversion in any way made it possible for Lamb, either personally or through Enterprises, to reap speculative profits based on insider information.[20] And we reject the possible suggestion in the lower court's opinion that the existence of an opportunity for speculative profits can be inferred from the fact of control alone,[20a] because such a suggestion is inconsistent with our responsibility to analyze the conversion in order to determine whether the possibility of unfair speculative profits might have existed at all even with full corporate control. Lamb's attempt to bolster his control of Air-Way by acquiring and then converting Air-Way Preferred may fall short of our aspirations for the conduct of controlling shareholders. But, to paraphrase Judge Clark, speculation, actual or potential, is the only vice within the purview of Section 16(b). Other possible corporate abuses that can possibly arise out of stock conversions do not now concern us. Blau v. Ogsbury, 210 F.2d 426, 427 (2 Cir. 1954). See Smolowe v. Delendo Corp., supra, 136 F.2d at 235.

The second ground advanced by the court below in support of its decision requires more elaborate analysis. Lamb and Enterprises maintain that, in general, the purchase by an insider of his issuer's convertible securities, followed in less than six months by their conversion, cannot facilitate short-swing trading for speculative profits in the convertible securities because normal market activity, including arbitrage trading, will insure that the convertible securities have a market price at least equivalent to the aggregate price of the securities into which they are convertible, if the value of the conversion security is in excess of the investment value of the convertible security without the conversion privilege.[21] We agree with this general proposition and believe that it is applicable in the present case. It is not seriously disputed that when the Air-Way Preferred was converted its market price was equivalent to the market price of the number of shares of Air-Way Common into which it was converted. True, the market value of the Air-Way Common received by Lamb and Enterprises on each relevant conversion date was higher than their cost in the Air-Way Preferred; but the market value of the Air-Way Preferred that was convert-

---

17. The gravamen of Blau's complaint sometimes appears to be that the rate at which Air-Way Preferred shares were exchanged for Industries' Common in the merger was too favorable to owners of Industries shares.

18. There is no suggestion that the accomplishment of this merger in this fashion violated any applicable corporate law. Lamb might have put the stock-for-stock merger plan to a vote at an Air-Way annual meeting, but apparently he was not required to do so.

19. Even a noncontrolling "insider" has the power to misuse inside information for speculative purposes by trading in light of the inside information to which he is privy. A "controlling insider" also can manipulate corporate activity in order to create favorable short-swing trading situations. But certain types of transactions may not present any opportunity for the exercise of either "noncontrolling" or "controlling" insider power to misuse inside information.

20. See note 24 infra.

20a. Of course, the activities of insiders in transactions within the possible ambit of Section 16(b) may take many forms, and in this opinion we limit the applicability of our observations to situations similar to the one presently before us.

21. See Graham, Dodd & Cottle, Security Analysis, 603–04 (4th ed. 1962).

ed on each date fully reflected that appreciation over their cost. Furthermore, after the conversion, Lamb and Enterprises retained the investment position in the securities of Air-Way that they had acquired during the summer of 1955. The appreciation in the value of this position that had occurred since then continued to be at the risk of the market and could disappear if the market price of the common thereafter declined. In view of this situation, it would seem to be a cold fact of the market that the conversion could not afford Lamb or Enterprises opportunities to realize a trading gain based on speculative judgment exercised when they purchased the Air-Way Preferred. Indeed, by converting, Lamb and Enterprises would appear to have reduced their opportunity for speculation because they surrendered the protection of a senior position and gained no compensating advantage. Ordinarily an investor would convert in this situation, where the convertible security is protected against dilution and has not been called for redemption, only because he hoped to gain a long-term benefit from receiving dividend income in excess of the dividend payable upon the convertible security. Here the conversion would appear to have been prompted by Lamb's desire to increase his control of Air-Way. But whatever the motives that prompted this conversion, we hold that the economic equivalence of the Air-Way Preferred and the Air-Way Common and the unchanged investment position of Lamb and Enterprises combined to insure that this conversion afforded the insiders no opportunity to realize a gain by speculative trading in Air-Way Preferred. For this reason, we hold that the conversion was not a Section 16(b) sale of the Preferred. See Heli-Coil Corp. v. Webster, supra, 352 F.2d at 172–173 (Hastie and Kalodner, JJ. dissenting in part). See also Blau v. Max Factor & Co., supra.

The district court implicitly recognized the force of much of this argument based on economic equivalence and unchanged investment position; yet it held that the Air-Way Common was not the economic equivalent of the Air-Way Preferred and that Lamb and Enterprises had substantially changed their investment position. It reached this result by noting that the Common conferred greater voting power, permitted greater dividends, and was more easily marketed. In the present case we do not find these facts determinative of the issues posed by Section 16(b), and disagree with the result the district court reached. It is true that the conversion increased the voting power of Lamb and Enterprises. Each share of Air-Way Preferred had one vote and each of the 3½ shares of Air-Way Common (or, after the two-for-one split, 7 shares of Air-Way Common) obtainable upon conversion had one vote. However, the increase in voting power would seem to be irrelevant to the central question whether the conversion facilitated short-swing trading in the Air-Way Preferred. If the voting power of the Air-Way Common had value, that value would be forthwith reflected in the value of the Air-Way Preferred because the Preferred was immediately convertible into Air-Way Common. In short, the increased voting power incident to the conversion conferred no trading advantage "and, therefore, is not relevant to our present problem." Heli-Coil Corp. v. Webster, supra 352 F.2d at 172 (Hastie and Kalodner, JJ., dissenting in part). Parallel reasoning leads us to the conclusion that the different dividend attributes of the Air-Way Preferred and the Air-Way Common are also irrelevant for present purposes because this difference did not present Lamb and Enterprises with the possibility of reaping a trading advantage.[22] Cf. Blau v. Max Factor &

---

22. It might be argued that a conversion from preferred to common with different —potentially more generous—dividend attributes involves at least the possibility of insider abuse and thus should be brought within the ambit of Section 16(b).

The argument would be that a controlling insider could purchase convertible securities of his issuer, engineer the declaration of dividends on the common and then convert just prior to the public announcement of the dividend. The difficulty with

Co., supra. Finally, we do not believe that it was appreciably more difficult to market Air-Way Preferred than Air-Way Common. Anyone wishing to sell Air-Way Preferred needed only to convert it into Air-Way Common, which was listed on the American Stock Exchange. We cannot agree with the district court's conclusion that the relative marketability of these securities destroyed their otherwise economic equivalence. Ibid.

 The limitations inherent in our holding, the questions it leaves unresolved, and some general observations on its scope should be set forth, lest we be misunderstood. We do not hold that the economic equivalence of that which an insider surrenders and that which he receives in an exchange always, or even usually, will suffice to remove the exchange from the ambit of Section 16(b). To the contrary, sales or purchases by an insider of his issuer's securities for cash, the securities of a different company, or other property are within the reach of Section 16(b), even though, if these are arms-length transactions, each side will receive what it considers to be at least economically equivalent to what it sur-

rendered. Focus on the factor of economic equivalence is only relevant when—as in a conversion or a reclassification—that which the insider surrenders and that which he receives are simply different forms of the same participation in his issuer. Second, it should be noted that the "economic equivalency" argument may not necessarily be of equal relevance in each of the four prototype situations in which a conversion may be paired with another transaction in an attempt to establish a violation of Section 16(b).[23] For reasons previously stated, we find the argument persuasive in the case of an admitted purchase by an insider of his issuer's preferred followed less than six months later by the preferred's conversion into common. For the time being, we leave open the further question whether this argument is equally persuasive in the second situation—the conversion by an insider of his issuer's preferred, which has been held for more than six months, followed less than six months later by a new purchase of his issuer's preferred at a lower price. We also leave open the relevance of "economic equivalence" in the third and forth prototype situations

this argument is that this danger exists independently of short-term trading by controlling insiders in their issuer's stock. For example, in the stated hypothetical, precisely the same oportunity for abuse would exist if the insider had held the convertible security for many more than six months. Furthermore, the insider need not dispose of the common he acquired in order to reap the benefit of the extravagant dividend payout he has arranged. We do not believe Section 16(b) should be used to remedy the problem of insider-inspired excessive dividend payouts when there exists no Section 16(b) "sale" and "purchase" giving rise to the possibility that insiders could realize short-swing trading profits. Support for this position is found in the language of Section 16(b): it speaks of recovering "profit realized * * * from any purchase and sale, or any sale and purchase." It does not provide for the recovery of unfair dividend payout standing alone; yet in the above hypothetical this is all that can be called unfair. It would be perverse to conclude that the factors of economic equivalence and un-

changed investment position combine to insure that a conversion such as this cannot afford insiders any opportunity to realize short-swing trading gains and then conclude that the possibility of insider-inspired, excessive dividend payouts, which cannot be recovered alone, requires that the insider's unrealized gains be recovered by their issuer. Of course, in the above hypothetical, Section 16(b) might apply if a *sale* of the common occurred within six months from the purchase of the convertible security. See text accompanying note 25 infra. We also take pains to point out that what we say here in no way modifies the rule of this Circuit as to when dividends received by an insider are includable in an otherwise recoverable "profit realized." See Adler v. Klawans, 267 F.2d 840, 849 (2 Cir. 1959).

23. Of course, more variations can be worked out if conversions are paired with other conversions, reclassifications or the like. Here we are concerned simply with the variations that arise when a conversion is paired with an admitted purchase or sale.

when the question is whether a conversion is a Section 16(b) "purchase" by an insider of his issuer's common, and, in the one case, an admitted sale of his issuer's common at a higher price precedes that conversion by less than six months, and, in the other, an admitted sale follows the conversion by less than six months. We do think it is clear that "logic" does not require that "economic equivalence" be equally relevant in each of these four prototype situations; nor does it follow logically that because one of these four prototype situations may possibly facilitate short-term speculative trading all do. In the first two prototype situations the question is whether the conversion facilitates short-term speculative trading in the issuer's preferred. The question in the latter situations is whether the conversion facilitates short-term speculative trading in the issuer's common. It also may make a difference whether the admitted purchase or sale precedes the conversion as in the present and in the third situations, or whether it follows the conversion as in situations two and four. Third, this analysis should serve to emphasize that when a court examines a particular transaction to determine whether it might possibly have facilitated unfair insider trading it should first ascertain whether there existed any possibility of abuse presented by the prototype situation the court has before it. Thus, in the present case, if we assume for the moment that, despite the factor of economic equivalence, a conversion followed by a sale of the common facilitates speculation in the common, this is a sufficient reason for considering the conversion a Section 16(b) "purchase" of the common; but it is not, standing alone, a reason for concluding that the conversion should be considered a Section 16(b) "sale" of the preferred. In order to support this latter conclusion it must be established that the conversion in some way facilitated short-term speculative trading in the preferred; this has not been established here.[24] Finally, at the risk of being obvious, we simply note that "economic equivalence" has no relevance in a situation where the convertible

24. A majority of the Third Circuit in Heli-Coil Corp. v. Webster, supra, 352 F.2d at 165, suggested that an insider with inside information of the date on which debentures will be called by his issuer can reap a trading advantage by converting "for when the debentures are called they are no longer tied to the price of the stock. In advance of the information respecting the call being made public, if the insider has any knowledge that will affect the future price of the common stock, such as an increased dividend to be paid after the senior security has been retired, he would be in a position to profit by his conversion." Ibid. We disagree. All convertible securities provide for notice, usually of at least 30 days, prior to the redemption date. During the period after notice and before redemption the convertible securities may be converted. In fact, notice of redemption is normally a means of forcing conversions. During the period after the notice of redemption is given and while the security is still convertible at any time, it remains the market equivalent of the common. Therefore, the holder of the convertible security who has inside knowledge of the redemption is not in any better position than the person without such inside information. The plaintiff also has attempted to demonstrate how Lamb's and Enterprises' conversions enabled them to capitalize on inside information. He states that the market price of Air-Way Common increased 20 per cent in the two-months period between the time Lamb and Enterprises acquired and converted the Air-Way Preferred. Blau goes on to argue that this market increase was caused by the 100 per cent stock dividend and the declaration of the regular quarterly dividend in September. Blau concludes that Lamb and Enterprises could only capitalize on this increase in value by converting. We disagree. If they had not converted and the market price of the Air-Way Common had increased, as it did, the value of the Air-Way Preferred would have increased to the same extent. By holding their investment in the form of Air-Way Common rather than in the form of Air-Way Preferred, Lamb and Enterprises did not obtain any greater investment value. Their investment in Air-Way was still at risk. We should always have in mind that a holder of Air-Way Preferred could choose to convert to Air-Way Common whenever he wished to do so.

security did not trade at a price at least equivalent to the aggregate price of the securities into which it was convertible.

██ We think that in cases like the present involving the purchase of a convertible security and its subsequent conversion, the issue should be whether the underlying security has been sold within six months from the acquisition of the convertible security. See Heli-Coil Corp. v. Webster, supra, 352 F.2d at 171–174 (Hastie and Kalodner, JJ., dissenting in part). Where the convertible security is purchased, converted, and the underlying security sold, all within less than six months, we believe the entire profit resulting from the transaction is recoverable, either on the theory that the accrued profit on the preferred as well as the profit on the common has been realized, "within * * * [a] period of less than 6 months" for purposes of the statute, or else upon the theory that, under such circumstances, the purchase of a convertible preferred may be treated as a purchase of common stock, for the statute defines "purchase" as including "any contract to buy, purchase or otherwise acquire," and the purchase of the convertible security includes a contractual right to acquire the conversion security. This view of the statute is reflected in amended Rule 16b–9 recently adopted by the Securities & Exchange Commission, effective February 17, 1966, and applicable to all transactions occurring after that date. Securities Exchange Act Release No. 34–7826 (Feb. 17, 1966). Amended Rule 16b–9 provides an exemption from the ambit of Section 16(b) for the conversion of an equity security, which is convertible into another equity security of the same issuer, provided that no more than fifteen per cent of the value of the security received at the time of the conversion is received or paid in cash or other property. Ibid. The stated reason for this exemption is that, in the judgment of the Commission, the conversion of a convertible security into its conversion security is not "comprehended within the purpose of Section 16(b) * * *." Ibid. We agree. Furthermore, for all of the above reasons, we hold that the same is true of the conversion involved in the present case.[25]

### B. Transactions Between Enterprises and Other Corporations Controlled by Lamb.

██ The district court held that the transaction on June 6, 1955 in which Enterprises acquired from Industries 68,100 shares of Air-Way Common plus other assets was a Section 16(b) "purchase" by Enterprises, which the lower court then matched against the October 6, 1955 sale by Enterprises to Industries of 10,500 shares of Air-Way Common and the October 13, 1955 sale by Enterprises to the Edward Lamb Foundation, Inc. of 6,500 shares of new Air-Way Common.[26] Thus the district court held Lamb and Enterprises jointly liable for short-swing profits totaling $153,526.50.[27] Lamb and

25. The Securities and Exchange Commission as *amicus* urges that we reach the result we here reach. The Commission would have us so hold on the ground that the conversion was a Section 16(b) sale of the Air-Way Preferred but no profit was realized at that time. See Heli-Coil Corp. v. Webster, supra.

26. By October 1955 Industries had become a subsidiary of Air-Way as a result of the exchange of Industries Common for Air-Way Preferred. Whereas in June 1955 Lamb had owned 97 per cent of Industries, in October Lamb's interest in Industries was as a holder of in excess of 50 per cent of the Air-Way Common.

27. If the amount Enterprises received on the October 13, 1955 sale is matched against the purchase price it paid on June 6, 1955 for 6,500 shares there is no profit on the paired transaction. But the district court held that, since there was a "short-swing" transaction, the value of the stock dividend in the nature of a 2-for-1 split was recoverable in its entirety. This totaled $60,937.50; the value of the 6,500 shares issued as a stock dividend on the 6,500 acquired on June 6, based upon a market high of $9⅜ on the date of payment. Our holding that the June 6, 1955 transaction was not a Section 16 (b) "purchase" by Enterprises permits us to avoid discussion of the lower court's treatment of a stock dividend as a recoverable profit.

Enterprises appeal this determination, contending *inter alia* that the June 6, 1955 transaction was not a Section 16(b) "purchase" by Enterprises. The Securities and Exchange Commission also urges that we adopt this view. For reasons given hereafter we reverse the district court and hold that the June 6, 1955 transaction was not a "purchase" by Enterprises within the meaning of Section 16(b).

It must be recalled that on June 6, 1955 Lamb controlled 100 per cent of the stock of Enterprises and 97 per cent of the stock of Industries—the remaining 3 per cent was owned by several employees or former employees of Industries. By virtue of Lamb's pervasive control over Industries and Enterprises, there was at most a token change in the insider's investment position when Air-Way Common was transferred from Industries to Enterprises; Lamb indirectly owned this stock both before and after its transfer. Thus Lamb did not place himself where he could make any more advantageous use of inside information for speculative purposes than he could have before the transfer. Nor did the decision to transfer the Air-Way Common alter the nature of his investment, increase or decrease the amount invested, or alter in any way the risks involved.

The rule announced by Judge Clark in the first half of Blau v. Mission Corp., 212 F.2d 77 (2 Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872 98 L.Ed. 1138 (1954) seems applicable here. In that case a parent corporation, which was an insider in Tide Water Associated Oil Company because of stock ownership in excess of 10 per cent, transferred a substantial block of Tide Water stock to its (the parent's) wholly-owned and newly-organized subsidiary holding company established for that purpose. Our court held that this transfer was "mere bookkeeping without the reach of the statute" and thus was not a Section 16(b) "sale." 212 F.2d at 81. After characterizing the transaction as "a mere transfer between corporate pockets," this court also said, 212 F.2d at 80:

> To hold otherwise would be to place entirely undue stress on the corporate fiction reaching harsh and wooden results quite unnecessary to achieve the purposes of the act. Until, going beyond the corporate forms, some new individuals entitled to share in the ultimate profits enter the picture there has been no real sale of stock.

In the present case the district court rejected the analogy between the first transaction in *Mission Corp.* and the transfer of Air-Way to Enterprises. In doing so, the court below stressed the absence of complete ownership of the Industries stock by Lamb. It concluded that the rule of the first half of *Mission Corp.* should be applied only to cases involving 100 per cent ownership because there were no "precise and generally applicable criteria" that would enable courts to know how much control less than 100 per cent was enough to invoke this rule. 242 F.Supp. at 159. We sympathize with this position because we have been unable to formulate a bright-line rule as to how much stock control is enough to invoke the rule. Nevertheless, we agree with the Securities and Exchange Commission's conclusion that in the present case the amount of Industries stock not owned by Lamb—approximately 6,000 of 196,000 shares—is not sufficient to affect the unity of interest between Lamb, Enterprises and Industries. The transfer to Enterprises of the Air-Way Common in no way increased Lamb's power to make use of inside information, and for this reason that transfer was not a Section 16(b) "purchase" of the Common.

*C. Other Transactions.*

■ On September 15, 1955 Lamb sold 300 shares of Air-Way Common on the American Stock Exchange. The district court matched that sale against the "purchase" by Enterprises of 300 shares on June 6, 1955 as part of the 68,000 shares acquired from Industries on that date. According to the lower

court this resulted in a recoverable profit of $2,702.52. Lamb does not challenge the matching of transactions by him against transactions by Enterprises, which corporation was 100 per cent controlled by Lamb and his family. However, because we have held that the June 6, 1955 transaction was not a Section 16(b) "purchase" of Air-Way Common by Enterprises, this portion of the lower court's decision must also be reversed. Nevertheless, it would seem proper to match Lamb's September 15, 1955 sale of 300 shares of Air-Way Common (sold at a price totaling $5,757.12) against the Lamb purchases of 300 shares of Air-Way Common on the American Stock Exchange between March 18, 1955 and March 22, 1955 (at a cost of $4,091.10), which results in a profit recoverable from Lamb by Air-Way amounting to $1,666.-02.[28] We affirm to this extent.

■ In two instances the court below computed "realized profits" by comparing the market price of Air-Way Common prior to the 100 per cent stock dividend, in the nature of a stock split, with the market price of an equal number of shares after the stock split. In the first instance, the court matched 100 of the 10,500 shares "sold"[29] by Enterprises on October 6, 1955 against a "purchase" by Enterprises of 100 shares of new Air-Way Common on October 16, 1955. The "sale" on October 6 was at a price of $19 per share, resulting in total proceeds of $1,900. The October 19 "purchase" of new Air-Way Common, which reflected the 2-for-1 split, was at a considerably lower price, $1,017. Thus, the "profit realized" according to the district court

was $883.00. In the second instance the lower court, without any recognition of the intervening stock split, matched 100 of the shares of Air-Way Common that Lamb had sold over the American Stock Exchange on September 15, 1955 against a purchase by Lamb on October 6, 1966 of 100 shares of new Air-Way Common.[30]

We agree with the Securities and Exchange Commission that when a purchase or sale that precedes a stock dividend (or stock split) is to be matched against a sale or a purchase made after the record date for the dividend distribution (or the split) there should be a proportionate adjustment in the price per share of the stock obtained or disposed of in the earlier transaction in order to determine the true measure of profit realized, if any, in the later transaction. Cf. Kornfeld v. Eaton, 217 F.Supp. 671 (SDNY 1963), aff'd, 327 F.2d 263 (2 Cir. 1964).

Adopting this approach we must reverse both of the lower court's computations of "profit realized" here under consideration because of failure to take account of the 100 per cent stock dividend in the nature of a stock split. In the first instance the sales price of one old share of Air-Way Common was $19; the purchase price plus commissions of one new share was $10.17. Two new shares were the equivalent of one old share. Therefore, the cost of one new share should have been matched against one-half of the price of an old share, that is, $9.50. It is apparent that once this adjustment is made there is no profit, and no recovery, because the cost of one new share exceeded the adjusted sales price. Similarly in the second instance, although the

---

28. Without revealing the basis for their computation counsel for Lamb and Enterprises state that the "profit realized" from matching the September sale of 300 shares against the purchase of a like number of shares in March totals only $1,616.04.

29. The October 6, 1955 disposition of 10,-500 shares of Air-Way Common by Enterprises to Industries would seem to be a Section 16(b) "sale." At that time Lamb no longer controlled 97 per cent of Industries. See note 26 supra.

30. It should be noted that the district court had already matched the 300 shares sold on September 15, 1955 against 300 shares previously purchased. See text accompanying note 28 supra. This would seem to be contrary to well-established Section 16(b) procedures. Gratz v. Claughton, 187 F.2d 46 (2 Cir.), cert. denied 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951) ("obviously no transaction can figure in more than one equation").

unadjusted sales price exceeded the purchase price, thus leading the court to conclude that a recoverable profit had been realized, once the sales price is adjusted to reflect the split, all profit disappears.

### D. *The Cash Dividends on Air-Way Common.*

 Blau maintains that the 30¢ per share cash dividend paid by Air-Way on August 1, 1955, to holders of record of Air-Way Common on July 20, 1955 should have been included as part of the "profit realized" on the following transactions: the 10,500 shares of old Air-Way Common "purchased" on June 6, 1955, and sold on October 13, 1955; the 6,500 shares of old Air-Way Common "purchased" on June 6, 1955, and the 6,500 shares of new Air-Way Common "sold" on October 13, 1955; and the 300 shares of old Air-Way Common "purchased" on June 6, 1955, and sold on September 15, 1955. Preliminarily we note that the cash dividends with respect to the first two transactions are not recoverable, because, as we previously have held, the acquisition by Enterprises on June 6, 1955 was not a Section 16(b) purchase and thus those paired transactions were not covered by Section 16(b). See note 22 supra. The claim for recovery of the cash dividend of 30¢ per share is, nevertheless, relevant to the transaction involving 300 shares of Air-Way Common. As to that issue we affirm the district court's conclusion that the cash dividend was, "too incidental and not 'so inextricably connected' with defendant's purchase-and-sale transactions to be included in the amount recoverable." 242 F.Supp. at 161. See Adler v. Klawans, 267 F.2d 840 (2 Cir. 1959). Air-Way had paid regular quarterly dividends since June of 1954; the 30¢ per share dividend declared on June 30, 1955 was an increase of only 5¢ per share over these prior quarterly dividends. In view of this dividend payment history we cannot say that the lower court erred in concluding that the June 1955 dividend was not part of a scheme of short-swing speculation.

### E. *Interest.*

 We affirm the district court's discretionary disallowance of interest on the "profit realized" recoverable by Air-Way in this action; we are unable to say that the denial was "either so unfair or so inequitable as to require us to upset it." Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962).

### IV. *Summary.*

The district court decided, and Lamb and Enterprises do not appeal from that decision, that certain purchases and sales of Air-Way Common in 1956 by Enterprises resulted in a recoverable profit of $589. We affirm. We also hold, for reasons previously stated, that the purchase and sale of 300 shares of Air-Way Common on the American Stock Exchange in 1955 resulted in a recoverable profit of $1,666.02. Blau also asserts that an additional liability of $5,556.38 results from matching purchases by Enterprises of 1,600 shares on the American Stock Exchange between May 2 and September 8, 1955, for an aggregate price of $24,843.62, against the sale by Lamb of $1,600 shares on October 6, 1955, at $19 per share to Lamb Industries, Inc. which was then a subsidiary of Air-Way Industries, Inc.; the defendants-appellants-appellees do not contest this additional liability. Furthermore, we conclude, as did the district court, that the 30¢ per share cash dividend was not recoverable in connection with the 1955 transactions, including the pairing of the 300 shares of Air-Way Common mentioned above. We affirm the discretionary disallowance of interest. In all other respects the decision of the court below is reversed.