**Margot NEWMARK, Plaintiff,**

**v.**

**R K O GENERAL, INC., Frontier Airlines, Inc., Defendants.**

**No. 67 Civ. 4914.**

United States District Court
S. D. New York.

Dec. 6, 1968.

Kaufman, Taylor, Kimmel & Miller, New York City, by Stanley L. Kaufman, Shephard Miller, and Allan Peckel, New York City, for plaintiff.

Regan, Goldfarb, Powell & Quinn, New York City, by John J. Galgay, and Peter G. Corbett, New York City, for defendant RKO General, Inc.

## OPINION

TYLER, District Judge.

This action under Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b)) raises some of the questions left unresolved by the Court of Appeals for the Second Circuit in Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied 385 U.S. 1002, 87 S. Ct. 707, 17 L.Ed.2d 542 (1967), that court's most recent in-depth excursion into the complicated world of short-swing insider profits.

Plaintiff's claim arises out of the events surrounding the 1967 merger of Central Airlines, Incorporated ("Central") into Frontier Airlines, Inc. ("Frontier"), the surviving corporation being Frontier. (For convenience, I will refer to the merged corporation as "Central-Frontier.") Plaintiff, a Frontier security holder,[1] claims that RKO General, Inc. ("RKO") realized short-swing insider profits in transactions in Central common stock and convertible debentures, and that the claim now belongs to Central-Frontier as a result of the merger. At all relevant times, Central common was traded over-the-counter.

With the material facts undisputed, defendant RKO has moved for summary judgment, and plaintiff has cross-moved for summary judgment on the issue of liability, reserving for future determination the calculation of the exact amount of profits claimed to have been realized by RKO.[2]

1. In an affidavit verified on April 4, 1968, plaintiff avers that since April, 1967, she has been the owner of Frontier 5½% debentures in the face amount of $2,000 and warrants entitling her to purchase Frontier common.

2. Rule 56(c), F.R.Civ.P. Although the failure to show the existence of profits will preclude the grant of summary relief on the issue of liability, see e. g., Blau v. Lamb, 163 F.Supp. 528, 532 (S.D.N.Y.1958), once the existence of

## I.

### FACTS

During the period immediately preceding April 5, 1967, RKO held 56% of the outstanding common stock of Frontier and was in the process of negotiating a merger between Frontier and Central. On that date, the management of the two airlines agreed in principle to a merger of Central into Frontier with an exchange ratio of one share of Frontier common stock for each 3½ shares of Central common stock.

On May 3 or 4, 1967, RKO contracted with a small number of major Central stockholders to purchase 738,251 shares of Central common, representing 49% of Central's outstanding shares, plus $500,000 principal face amount of Central convertible debentures, which were convertible into an additional 149,994 shares of Central common.[3] The purchase was to be at the effective rate of $8.50 per share of common stock. As a part of this agreement, RKO acquired the promises of Central shareholders owning approximately 66% of the Central common that they would vote the shares in favor of the merger. At the time of the execution of this purchase agreement, neither the public nor the stockholders of the two corporations had been informed of the proposed merger.

On May 4, 1967, the two airlines executed a formal agreement of merger at the previously agreed upon exchange rate. A press release on the merger agreement was issued the same day.

The next day, May 5, 1967, reports in the financial press described the merger based on the press release, and disclosed to the public RKO's contract with the Central security holders.

The necessary approval of the merger by shareholder majorities of the two airlines was obtained on July 27, 1967. On the same date, the Frontier shareholders ratified a two-for-one split of Frontier common stock, which had been declared by Frontier's board of directors on May 10, 1967. To compensate for the stock split, the terms of the merger were adjusted to provide for an exchange rate of two shares of Frontier for each 3½ shares of Central.

The requisite Civil Aeronautics Board ("CAB") approval of the merger became effective on September 1, 1967, subject to the written acceptance by Frontier of certain conditions. Thereafter, on September 18, 1967, RKO received the Central stock and convertible debentures for which it had previously contracted and paid a total purchase price of $8,550,082.50. On the same day, the merger agreement was filed with the Secretary of State for the State of Nevada, where both Frontier and Central had been incorporated.[4] The CAB received notice of Frontier's acceptance of the regulatory board's conditions to the merger on September 20, 1967. At the same time, Frontier requested that the CAB transfer Central's certificate of public convenience effective October 1, 1967.

Apparently it was on October 1, 1967, that the exchange of securities

---

profit has been established, a court may enter partial summary judgment reserving for trial the issue of the amount of damages. See Roth v. Fund of Funds, Ltd., CCH Fed.Sec.L.Rep. ¶ 92,147 (S.D.N.Y. 1968); 2 Loss, Securities Regulation 1049 (2d ed. 1961).

3. It should be apparent from the fact that these debentures were convertible into over $1.2 million worth of common stock that the market value of the debentures was virtually dependent upon the market value of Central common stock. The parties do not dispute that these debentures were "equity" securities.

4. RKO contends that the merger became effective under Nevada law upon this filing. Plaintiff disagrees, relying upon the terms of the merger agreement and the CAB order. She claims that the merger did not become effective until October 1, 1967. Since neither date is beyond six months from May 3, 1967, the disagreement and argument here apparently go only to the questions of which date should be used to determine the specific amount realized by RKO and its disposition of Central stock. Irrespective of which date is chosen, the amount is certainly greater than the $8,550,082.50 which RKO paid to acquire the securities. Def.'s Brief, p. 15.

between Central and Frontier was consummated. In exchange for its Central common stock and convertible debentures, RKO received 420,850 shares of Central-Frontier common and Central-Frontier debentures convertible into 85,831 shares of Central-Frontier common.

On the basis of these facts, plaintiff contends that RKO's acquisition of Central securities and subsequent disposition within six months in the course of the merger with Frontier falls squarely within the proscription of Section 16(b). RKO raises some eight separate rebuttals to this basic contention of plaintiff. The first three, which will be dealt with in Part II of this opinion, are arguments that plaintiff has failed to establish three elements of its Section 16(b) claim —"purchase", "sale", and "profit realized". The final five arguments are a variety of defenses based on administrative rules, federal statutes, and common law principles. This group of arguments will be discussed in Part III of the opinion.

## II.

## "PURCHASE", "SALE", AND "PROFIT REALIZED"

■ Defendant aims at the jugular of this claim under Section 16(b), 15 U.S.C. § 78p(b),[5] by arguing that none of the primary elements of such a claim has been established by the facts in this case. Although there is a variety of factual and legal arguments made by RKO on these three points, a common thread can be discerned. Defendant consistently maintains that the transactions already described do not present a situation which lends itself to the type of insider abuse that Section 16(b) was designed to prevent.

■ The most hotly contested issue in this case is whether there was a "sale" of the Central securities, but it will be helpful to consider the "purchase" issue first since its outcome has some effect upon points raised in the main question. Defendant admits, as it must, that under any normal meaning of the word, it made a "purchase" of the Central securities for cash on September 18, 1967. (Def.'s Brief, p. 29.) But, it argues, "the substance of the transaction and the intent of the parties was that RKO was not purchasing shares of Central but shares of [Central-Frontier]." Even if I were to concede that such was the sole purpose of the parties to the transactions, Section 16(b) was designed to protect the investing public and shareholders other than the ones involved in the particular acquisitions and dispositions of shares. While RKO was probably primarily concerned with the merger and with maintaining its dominant position in Frontier, the method it used to effectuate its purpose was the acquisition of the common stock and convertible debentures of Central. In view of the purposes of Section 16(b) to protect against short-swing insider dealings in equity securities regardless of the subjective purpose of the insider, I must reject this novel argument. I find that plaintiff has established that there was a "purchase" of Central securities by RKO.

5. "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * * This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

As I have noted, the central issue is whether the exchange of RKO's Central securities for securities of Central-Frontier was a "sale" within the meaning of Section 16(b). Under the "automatic" or "rule of thumb" test of Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947), and its progeny,[6] this exchange clearly would have fallen within the ambit of the statute since RKO owned Central securities before the merger but did not afterward. But the "rule of thumb" test has been discarded in this Circuit in favor of the so-called "pragmatic" test, Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied 385 U.S. 1002, 87 S. Ct. 707, 17 L.Ed.2d 542 (1967), and this test appears to be the criterion that will govern in other Circuits, Petteys v. Butler, 367 F.2d 528 (8th Cir. 1966), cert. denied 385 U.S. 1006, 87 S.Ct. 712, 17 L. Ed.2d 545 (1967). After a survey of the legislative history of Section 16 and a distillation of the important decisions in this particular area, the Court of Appeals for the Second Circuit articulated the rule "whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." Blau v. Lamb, supra, 363 F.2d at 518. This rule, although it is less than automatic in its application, still has the advantage of being objective, because once the possibility of insider abuse is found to exist Section 16(b) must be applied irrespective of any actual abuse. Id., at 516.

As I understand it, defendant makes two basic arguments grounded upon Blau v. Lamb. The first is that the exchange in question was tantamount to the type of conversion of convertible securities into underlying common that existed in Blau v. Lamb and other similar cases. Petteys v. Butler, 367 F.2d 528 (8th Cir. 1966), cert. denied 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967); Blau v. Max Factor & Co., 342 F.2d 304 (9th Cir.), cert. denied 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); Ferraiolo v. Newman, 259 F.2d 342 (6th Cir.), cert. denied 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1958); Blau v. Mission Corp., 212 F.2d 77 (2d Cir. 1954); Roberts v. Eaton, 212 F.2d 82 (2d Cir.), cert. denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954). The second argument is based on the theory that the pragmatic test should be extended beyond the "economic equivalent" situations to cover the facts of this case.

Each of the cases on which defendant relies for its first argument involve either the conversion, Ferraiolo v. Newman, supra; Blau v. Max Factor, supra; Petteys v. Butler, supra, or reclassification, Roberts v. Eaton, supra; Blau v. Mission Corp., supra, of one class of an insurer's securities into another of the same issuer. The basis for the conclusion in these cases, clearly set out in Blau v. Lamb, 363 F.2d at 521–522, is that the two types of stock were virtual economic equivalents and the conversion or reclassification did not present an additional opportunity for insider abuse. RKO contends that the securities which it gave up and those which it received were virtually economic equivalents.

Initially, I question whether an exchange of two different issuers' securities could ever present the "economic equivalence" issue that appears to be the heart of the cases on which RKO relies. My reading of Blau v. Lamb indicates to me that the economic equivalence on which the court based its reasoning was the objective, clearly demonstrable, market inter-changeability of the two types of securities. It would seem to be nearly impossible to demonstrate such economic equivalence where the issuers are substantially different companies. Cf.

---

6. The approach taken in *Park & Tilford* has been followed relatively recently. See, e. g. Western Auto Supply Co. v. Gamble Skogmo, Inc., 348 F.2d 736 (8th Cir. 1965), cert. denied 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); Heli-Coil v. Webster, 352 F.2d 156 (3rd Cir. 1965); but see Petteys v. Butler, 367 F.2d 528 (8th Cir. 1966), cert. denied 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967).

Blau v. Mission Corp., supra. As the Blau v. Lamb court stated:

" * * * sales or purchases by an insider of his issuer's securities for cash, *the securities of a different company,* or other property are within the reach of Section 16(b), even though, if these are arms-length transactions, each side will receive what it considers to be at least economically equivalent to what it surrendered. Focus on the factor of economic equivalence is only relevant when—as in a conversion or a reclassification—that which the insider surrenders and that which he receives are simply different forms of the same participation in his issuer." (Emphasis added.) 363 F.2d at 523.

Upon this reasoning and definition of economic equivalence, I conclude that RKO is incorrect in its argument that in this case there was an "exchange" of different forms of the same participation in the issuer.

But an even more fundamental difficulty confronts RKO on this point. It is abundantly clear that the 49% holding of Central common stock before the merger is in no way equivalent to the 20–25% holding of Central-Frontier common stock which it received in exchange.[7] RKO vigorously contends that the court should take into account its prior ownership of 56% of the common stock of Frontier in considering the economic equivalence of the securities exchanged. Briefly stated, its argument is that after the merger,

"[RKO] still held an equity position in a local service airline, which was no more than the sum of its equity position in both lines prior to the merger, and that equity position was at all times subject to the vicissitudes of the market place." Def.'s Brief, p. 26.

I reject this argument for two reasons. First, RKO's holdings of Frontier furnished no assurance to the stockholders of Central that the value of their securities would be adequately protected in the merger. Second, as is true in so many mergers, the record indicates that the resulting corporation was more than the sum of its constituent parts.[8]

Defendant makes an independent argument from Blau v. Lamb based on the general principle that no "sale" will be found where the transaction does not admit of the possibility of insider abuse. Basically, RKO urges that by the time it became an insider under the statute, and hence was presumed to have inside information, it was "locked into" the merger at the 1 for 3½ ratio, and could not possibly use any insider information it might have acquired.

Defendant rests this argument upon two cases decided some time ago by the Court of Appeals for this Circuit, Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954) and Stella v. Graham-Paige Motors Corp., 232 F.2d 299 (2d Cir.), cert. denied 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956). A brief discussion of these two cases will be helpful.

In *Ogsbury,* the defendant director-officer had been awarded a non-assignable option to purchase 10,000 shares of the company's common stock as a part of his compensation. The option was exercised in December, 1945, but the actual exchange did not take place until December, 1948. In refusing to accept plaintiff's argument that the "purchase" occurred in December, 1948, the court held that the date of exercise was the date of "purchase" because defendant then "incurred an irrevocable liability to take and pay for the stock." 210 F.2d at 427. In elaborating its reasoning, the court stated:

" * * * It matters not to the speculator who has title or possession or

---

7. Although the analysis pertains only to the transactions in common stock, it is equally applicable to transactions in the convertible debentures.

8. As the CAB examiner stated, " * * * [I]t is clear that the combined operations of Frontier and Central will be more profitable than the operation of two carriers as separate entities * * * "

who can vote the stock or receive dividends. What he needs is firm assurance that a fixed quantity can be acquired or disposed of at a fixed price; and his commitments are on that basis. And speculation, actual or potential, is the only vice within the purview of § 16(b). * * *" 210 F.2d at 427.

Although the language would appear to indicate that the date of purchase was the date on which the option was granted, the court was not required to reach that question since the December, 1945, date was outside the statutory period of six months and was sufficient to allow summary judgment for defendant.

The court was presented with a somewhat different factual pattern in *Stella*. There the defendant had contracted to purchase the statutory 10% of the company's common stock subject to the condition that it receive a loan from a named bank to pay for the securities. The court rejected the defendant's contention that the date of the contract was the date of purchase. It held that the "purchase" could not occur until the condition precedent had been fulfilled. The court also rejected Graham-Paige's argument that it could not be considered an insider at the time of the purchase which made it a "beneficial owner" of over 10% of the common stock of the corporation.

The court went on to consider a question wholly unnecessary for its decision, whether or not Graham-Paige had become a "beneficial owner" of the securities at the date of the contract. Its reasoning on this point was as follows:

"In Blau v. Ogsbury, supra, the question was when the holder of an option to buy stock became the 'beneficial owner.' We held that it was not (a) the date when he acquired the option, nor (b) the day when, having exercised it, he paid for the stock and obtained legal title to it, but (c) the day when he exercised the option with the result that he had then a fixed right and obligation under an executory contract. See also Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, 987 where we said that, upon the exercise of an option, the optionee becomes an 'insider' and thus within the Congressional purpose to 'protect the outside stockholders against at least short-swing speculation by insiders with advance information.' Our reasoning was that one who holds an unexercised option is not usually in a position to obtain such information from the company. Here Graham-Paige, as long as it had an election to back out of the agreement to purchase, was not an 'insider' under Section 16(b)." 232 F.2d at 301.

With due respect, I believe that the two cited bases for the court's dictum give no support for the conclusion reached. As I have pointed out, the defendant in Blau v. Ogsbury was a director-officer; hence, the court had no legal reason to consider the date on which he became a "beneficial owner" under the statute. The citation of Park & Tilford in the above quotation is no more helpful because the holding in that case was that the conversion of convertible preferred into common was a "purchase" within the meaning of the statute.

The obvious unstated assumption in the quoted dictum from *Stella* is that one cannot become a "beneficial owner" until the "purchase" which gives him more than 10% of the class of security. Although the court in *Ogsbury* and *Stella* was not directly faced with this question, I believe that it is presented squarely by the facts of this case.

On May 3 or 4, 1967, after executing the contract to purchase the Central securities, RKO was in the following position. It held an option to buy a very substantial number of Central securities at the equivalent price of $8.50 per share on the condition that the merger was consummated. It could rely upon the exchange ratio of one share of Frontier for each 3½ shares of Central. Thus, the condition precedent to its obli-

gation to purchase the shares was the same occurrence which concluded the disposition of the Central securities. Moreover, under the contract RKO had the obligation to process the merger through the federal regulatory procedures of the CAB.

With this brief background in mind, the date on which the inside information became available to RKO as a "beneficial owner" of Central securities must be decided. In my view, the pragmatic approach outlined in Blau v. Lamb compels the conclusion that RKO was a "beneficial owner" and presumably had inside information on May 3 or 4, 1967, when it contracted to acquire the Central securities on the sole condition that the merger be completed. See, Feldman & Teberg, Beneficial Ownership under Section 16 of the Securities Exchange Act of 1934, 17 West.Res.L.Rev. 1054, 1083–1095 (1966). I might add, without necessarily disagreeing with the dictum of the *Stella* court,[9] that it would tax the credulity of this court to believe that RKO did not in fact have inside information at the contract date by reason of its relationship with Central. See, Feldman & Teberg, supra, at 1090.

I turn now to the ultimate question under the rubric of Blau v. Lamb—did the disposition of these securities in any way allow the abuse of inside information which Section 16(b) was designed to prevent? I believe that it did in at least two ways. First, at the time the contract was made to acquire the Central securities, RKO was or could have been "gambling" that the established exchange ratio would turn out to be more advantageous than its effective purchase price of $8.50 per share. The second possibility of the misuse of inside information is a result of the fact that RKO could influence the speed and timing of the merger, and possibly its outcome. In this connection, two uncontroverted facts are pertinent: first, RKO had a very significant interest in both airlines before the merger, and thus as a practical matter may have been able to force abandonment of the merger; and, second, RKO had to specifically consent to certain conditions placed on the merger by the CAB because it controlled Frontier. Under the circumstances, I must conclude that there was a possibility of RKO's use of inside information.

There is no need to deal extensively with RKO's argument, derived from language in Roberts v. Eaton, 212 F.2d 82, 85–86 (2d Cir.), cert. denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954) and Shaw v. Dreyfus, 172 F.2d 140 (2d Cir.), cert. denied 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949), that since shareholders of Central were treated the same in the merger, there was no possibility of insider abuse. All shareholders were not treated the same, since none but RKO was afforded the opportunity to acquire stock or contract for its acquisition on May 3 or 4, 1967, at what turned out to be the bargain price of $8.50 per share. Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y. 1965). Nor does the fact that all Central shareholders may have benefitted from an increase in the value of their shares because of the merger aid defendant.

Finally, RKO argues that even if there was a "purchase" and a "sale" within the statutory period, there was no "profit realized". The primary basis for this argument is another of the conversion cases, Heli-Coil Corp. v. Webster, 352 F.2d 156 (3d Cir. 1965). In that case, the court took the "automatic" approach in finding that a conversion from a convertible preferred to common was a "sale" of the convertible preferred, but found that there was no "profit realized" on the transaction. I note that in Blau v. Lamb the Court of Appeals criticized the approach taken on the "sale" question in Heli-Coil. 363 F.2d at 519–520.

9. The court stated flatly, "that one who holds an unexercised option is not usually in a position to obtain [inside] information from the company." 232 F.2d at 301.

Moreover, the reasoning of the Third Circuit on the question of "profit realized" can be understood as an attempt to mitigate the inflexibility of the "automatic" test by coming to grips with the economic facts with which the Second Circuit was dealing in Blau v. Lamb. Since these economic factors have been analyzed hereinabove, reconsideration of the same points under this point is unnecessary.

In summary, it is ruled that plaintiff has established the three contested elements of its Section 16(b) claim.

### III.

### STATUTORY AND COMMON LAW DEFENSES

Defendant raises five "defenses", any one of which would immunize it from Section 16(b) liability if accepted by this court, despite the result already reached in Part II of this opinion. The most seriously asserted of these defenses is that this transaction is exempted from operation of the statute by Section 414 of the Federal Aviation Act, 49 U.S.C. § 1384, which states:

"Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the operations of the 'antitrust laws', as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

Defendant is correct in asserting that the immunity it urges flows from the statute, if at all, and that there is no requirement that the CAB have specifically exempted it from Section 16(b). See, Brotherhood of Locomotive Engineers v. Chicago & Northwestern Ry. Co., 314 F.2d 424, 432 (8th Cir. 1963). I must therefore consider the question whether Section 414 was intended to protect persons affected by a CAB order from a Securities Exchange Act claim under Section 16(b).

Delicate problems are often presented to a court hearing a federal claim against a party which is subject to a comprehensive regulatory scheme enacted by Congress. See, e. g., Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L. Ed.2d 325 (1963). But I think that this issue can be resolved by a relatively straight-forward interpretation of Section 414, thus avoiding the broader question of possible conflict between the federal aviation laws and the federal securities laws. See 2 Loss, Securities Regulation 427, n. 215 (2d ed. 1961).

Section 16(b) is a unique regulatory measure in that it purposely includes within its reach some innocent dealings in order to discourage transactions in an area in which abuse was rampant. Blau v. Lamb, 363 F.2d 507, 515 (2d Cir. 1966), cert. denied 385 U.S. 1002, 87 S. Ct. 707, 17 L.Ed.2d 542 (1966). Thus, the Congress did not prohibit short-swing transactions entirely, but provided only that the corporation could recover profits. See Adler v. Klawans, 267 F.2d 840, 844 (2d Cir. 1959). Therefore, an insider like RKO is in no way precluded from executing short-swing purchases and sales by Section 16(b).

I assume without deciding that Section 16(b) is a "restraint of law" within the meaning of Section 414, set out above. But the statute immunizes RKO only "insofar as may be necessary to enable [RKO] to do anything * * * approved * * * by such order." 49 U.S.C. § 1384, supra. Because of the peculiar method used by Congress in Section 16(b) of the Exchange Act, RKO was capable of legally completing the merger. Although it is presumably true, as defendant argues, that it "would undoubtedly not have proceeded with the merger if subject to a suit of the present type," there was nothing in Section 16(b) which prevented it from doing so. In other words, I see no direct conflict between Section 16(b) of the Exchange Act and the power of the CAB to approve mergers. See, Trans World Air-

lines, Inc. v. Hughes, 332 F.2d 602, 608 (2d Cir. 1964).

■ Defendant also claims that the Securities Exchange Commission ("SEC"), pursuant to its statutory authority, 15 U.S.C. § 78p(b), has exempted this transaction from the operation of Section 16(b) as not within the statutory intent. The first rule under which it claims is Rule 16b–7(a)(3), 17 C.F.R. § 240.16b–7, which is set out in the margin.[10] The short answer to defendant's argument is that it did not acquire "a security of a company * * * in exchange for a security of a company, which, prior to said merger * * * held over 85 percent of the combined assets * * *". RKO acquired Central-Frontier shares in exchange for Central shares. Central certainly did not own over 85% of the combined book value assets.

RKO also claims an exemption under Rule 16b–9(a), 17 C.F.R. § 240.16b–9, which is set out below.[11] This rule covers by obvious intent and plain language the conversion of one class of equity securities of an issuer into another of the "same issuer". I reject RKO's argument that Central-Frontier is the "same issuer" as Central, for reasons that should be obvious from my discussion of defendant's argument on this point at the outset of Part II of this opinion.

■■ Defendant raises two final defenses which have no merit. It argues that the very occurrence which we have found to be a "sale" was the cessation of the existence of Central and, therefore, the Section 16(b) claim never accrued to Central.[12] Suffice it to say that the claim accrued to Central at the moment of the operation of the merger. Acceptance of defendant's argument would create an unwarranted loophole in the law of Section 16(b) as applied to mergers. Finally, defendant claims that the overwhelming approval of the merger by the shareholders of both airlines operates to estop Central, and hence plaintiff, from asserting this claim. I reject this argument since it is the law of this Circuit that estoppel principles are inapplicable to Section 16(b) claims. Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962, 966 (S.D.N.Y.1965) and cases cited therein.

## IV.

### CONCLUSION

Plaintiff has established its Section 16(b) claim as a matter of law on the undisputed facts of this case. Therefore, I direct entry of summary judgment on the issue of liability in favor of plaintiff and deny defendant's motion for summary judgment.

It is so ordered.

10. "(a) The following transactions shall be exempt from the provisions of section 16(b) as not comprehended within the purpose of said subsection:

\* \* \* \* \*

(3) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company which, prior to said merger or consolidation, held over 85 percent of the combined assets of all the companies undergoing merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12-month period prior to the merger or consolidation."

11. "(a) Any acquisition or disposition of an equity security involved in the conversion of an equity security which, by its terms or pursuant to the terms of the corporate charter or other governing instruments, is convertible immediately or after a stated period of time into another equity security of the same issuer, shall be exempt from the operation of section 16(b) of the Act \* \* \* "

12. RKO concedes that claims which accrued to Central now belong to Central-Frontier. Def.'s Brief, pp. 51–52.