John BERSHAD, Plaintiff,

v.

Bernard P. McDONOUGH and Cudahy
Company, Defendants.

No. 68 C 2038.

United States District Court
N. D. Illinois, E. D.

June 19, 1969.

Jerome H. Stein, Chicago, Ill., Leibowitt, Milberg, Weiss & Fox, New York City, for plaintiff.

Herbert G. Underwood, Peer Pederson, Richard Houpt, and Dennis Eslick, Chicago, Ill., for Bernard P. McDonough.

Goldberg, Weigle, Mallin, Gitles & Parson, Chicago, Ill., for Cudahy Co.

MEMORANDUM OPINION

Cross-Motions for Summary Judgment

MAROVITZ, District Judge.

Pursuant to Section 16(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78 p(b), this action is brought by John Bershad, owner of certain of the common stock of defendant Cudahy Company (Cudahy) to recover for the benefit of Cudahy the purported "short swing" profits accruing to the defendant Bernard P. McDonough from the alleged purchase by him and sale to United States Smelting, Refining and Mining Company (Smelting) of 272,000 shares of the common stock of Cudahy within a period of less than six months. In part, Section 16(b) reads as follows:

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period less than six months, unless such security was acquired in good faith in connection with a debt previously contracted,

shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months."

Both sides have moved for summary judgment.

The essential facts in this case are undisputed. Cudahy is a Maine corporation whose common stock at all pertinent times was registered and traded on the New York Stock Exchange and not an exempted security under Section 3(12) of the Act, 15 U.S.C. § 78c(12). On March 15 and 16, 1967, Bernard P. McDonough purchased 141,363 shares of common stock of Cudahy from Continental Illinois National Bank and Trust Company of Chicago, which was acting as Executor of the Estate of Edward A. Cudahy. On the same date McDonough, as attorney in fact for Alma McDonough, purchased at a like sale for Alma McDonough 141,363 shares of Cudahy common stock. These purchases were made at a price of $6.75 per share. About two weeks later, on April 4, 1967, Bernard P. McDonough, Donald E. Martin, Carl L. Broughton and Otto Gressens were elected directors of Cudahy.

Thereafter, on July 20, 1967, Bernard P. and Alma McDonough each owners of 141,363 shares of the common stock of Cudahy, executed an agreement entitled "Option Agreement" with Smelting, a copy of which agreement is attached to the respective affidavits of the McDonoughs as "Affiant's Exhibit No. 1." At the same time that the option agreement was executed, the McDonoughs executed an escrow agreement, a copy of which is attached to both the respective McDonough affidavits as "Affiant's Exhibit No. 2." Also on July 20, 1967, the McDonoughs executed and delivered to Jack Wilder, President of Smelting, a proxy, a copy of which is attached as "Affiant's Exhibit No. 3" to the respective McDonough affidavits. All of the negotiations which resulted in the execution of the option agreement, escrow agreement and proxy took place in Wood County, West Virginia, on July 20, 1967.

Bernard P. McDonough resigned as an officer of Cudahy on July 18, 1967, and as a director of Cudahy on July 25, 1967. Those persons who were elected with McDonough as Cudahy directors on April 4, 1967, resigned as well. On July 28, 1967, these positions on Cudahy's Board of Directors were filled by persons with strong ties to Smelting, including Martin Horwitz, then Chairman of the Board of Directors of Smelting, and Jack Wilder, then President and a director of Smelting.

Under the Option Agreement, Smelting paid $350,000.00 to the McDonoughs for an option to purchase 272,000 shares of Cudahy common at a price of $9.00 a share on or before October 1, 1967. While the $350,000 belonged to the McDonoughs absolutely if the option were not exercised, the money was to be applied against the $2,448,000.00 purchase price if the option to buy the stock were exercised. Under the proxy agreement, the McDonoughs granted Smelting a proxy, irrevocable until October 1, 1967, to vote the 272,000 common shares of Cudahy. Following the execution of the option agreement, escrow agreement and proxy, certificates representing 272,000 shares of the common stock of Cudahy were delivered to Ralph Bohannon, which certificates remained in his possession in Clarksburg, West Virginia, until September 27, 1967.

On September 22, 1967, Martin Horwitz, then Chairman of the Board of Smelting, directed a letter to the McDonoughs notifying them of the exercise by Smelting of its option to purchase the 272,000 shares of Cudahy common stock. Five days later, in Parkersburg, West Virginia, delivery of certificates representing the 272,000 shares was made to Robert Pirie, who represented himself to be an attorney for Smelting. At the time of the delivery to Pirie, Bohannon, on behalf of the McDonoughs, received a check in the amount of $2,098,000.00 from Pirie.

From this relatively simple set of facts, the respective parties ask us to draw opposing conclusions. Defendants contend that what took place was the granting of an option which was not exercised and therefore did not mature into a sale of stock until more than six months after the stock was originally purchased by the McDonoughs. Plaintiff, on the other hand, suggests that the transactions between the McDonoughs and Smelting constituted a sale or contract to sell within the meaning of the statute.

Initially, it is clear that the law has drawn a distinction between an option and a sale. The pure option contract is one by which the owner of property agrees with another person that the latter shall have the right to buy the former's property at a fixed price within a fixed time. Graney v. United States, 258 F.Supp. 383, 386 (S.D.W. Va.1966), aff'd 377 F.2d 992 (4th Cir. 1967); Whitelaw v. Brady, 3 Ill.2d 583, 588–589, 121 N.E.2d 785 (1954). For a price, the optionee purchases the right to choose to conclude or not to conclude a particular transaction. For example, in Silverman v. Landa, 306 F.2d 422 (2d Cir.1962), which was an action to recover "short swing" profits allegedly accruing the result of violation of Section 16(b) of the Act, the optionee paid a premium of $4,000 for the right to buy 1,000 shares of stock at the market price ($24⅜ per share) on the date that the option was granted.

In the pure option agreement, "(w)hile the option extends the right to purchase, it imposes no binding obligation to do so upon the person holding the option." Graney v. United States, 258 F.Supp. 383, 386 (S.D.W.Va.1966), aff'd, 377 F.2d 992 (4th Cir.1967). Discussing such an agreement in relation to Section 16(b), the Second Circuit has said:

> "By its nature, the option is one-sided; it fixes the obligations, but not the rights, of the issuer. Landa cannot be said to have 'sold' or 'purchased' Fruehauf stock; should the options lapse unexercised (and in fact the call options did so lapse), no change in his beneficial ownership of the underlying security would occur. And, most importantly, any change would occur at the pleasure of the optionee. Only if both the options had been exercised within their first six months would there have been a 'sale and purchase' of the underlying security within the reach of § 16(b)."

Silverman v. Landa, 306 F.2d 422, 424 (2d Cir.1962).

*See also* Stella v. Graham-Paige Motors Corp., 232 F.2d 299, 301 (2d Cir.1956); Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954); Shaw v. Dreyfus, 79 F.Supp. 533 (S.D.N.Y.1948).

At the same time, in securities law as in other areas, things are not always what they seem to be. Recognizing this, the judiciary has recently shifted away from an objective, mechanistic interpretation of the securities statutes toward a more subjective, pragmatic approach designed to deal with the particular facts of a case in light of the purpose of the relevant statutory section. Lowenfels, "Section 16(b): A New Trend in Regulating Insider Trading," 54 Cornell L. Rev. 45, 50–57 (1968). In a recent Section 10(b) matter, the Supreme Court said the real questions to be asked in securities cases were whether the defendant's conduct was that type of behavior meant to be forbidden by the law and whether the broad purposes of the securities laws would be furthered by an application to the situation under review. SEC v. National Securities, Inc., 393 U. S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). Such an approach had already been invoked in a suit, similar to the instant action, to recover short-swing profits. In Blau v. Lamb, 363 F.2d 507, 516 (2nd Cir.1966), the Second Circuit noted that the scope of Section 16(b) was extensive, reaching every transaction, including options, "that might possibly permit an insider to use inside information unfairly * * *." The application of Section 16(b) in a particular situation consequently "depends upon

whether the transaction in question could tend to accomplish what the section was designed to prevent." *Id.* at 519. In brief, we are concerned more with substance than form.

It is plaintiff's contention that this case involves more than a pure option by virtue of the substantial down payment which was to be credited against the purchase price, the grant of the irrevocable proxy, and the resignations of McDonough and associates. Unlike the situation in Silverman v. Landa, *supra*, the money paid to the McDonoughs for the right to purchase Cudahy stock was not a premium, but was to be credited to the purchase price if the option to buy were exercised. To make the simple generalization that all such arrangements, regardless of the extent of the potential credit, fall outside the scope of Section 16(b) would open the door for flagrant violations of this remedial law. If, for instance, the holder of an "option" pays the "optionor" $900,000 for an "option" to buy certain securities for $1,000,000 within a set time, and that payment is to be credited to the sale price upon exercise of the "option," it could hardly be said, from a practical business viewpoint, that the "optionee" was not irrevocably bound to exercise his "option" and technically conclude the sale. A substantial down payment is, in reality, tantamount to a sale.

As this case presents a rather novel question, and there is no direct precedent to guide us in determining how substantial a down payment must be in order to be characterized as equivalent to a sale, we must resolve the issue "in a manner that is practical and logical and will be most consonant with the statutory purpose." Booth v. Varian Associates, 334 F.2d 1, 4 (1st Cir.1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965). The down payment paid by Smelting was $350,000. This payment amounted to approximately 14% of the total purchase price. In a similar, if not identical situation, Blau v. Allen, 163 F.Supp. 702 (S.D. N.Y.

1958), two parties agreed that the seller would deliver 800,000 shares of stock if the purchaser paid $2,000,000 within one week, another $10,000,000 two months later, and a final $10,000,000 two months after that. Under the agreement, any payments were to be treated as liquidated damages in the event all payments were not forthcoming. *Id.* at 705. The first payment was made within the required time. The court recognized that the payment, which was 11% of the sales price, "was not just a binder but constituted a substantial portion of the purchase price." *Id.* It then said that if the agreement was to be considered an option, then it appeared to have been exercised by initial down payment. *Id.* In our case, the down payment was made at the time the agreement was written as opposed to one week later as in Blau v. Allen. Yet, under the approach of that case, all that this distinction means is that the "option" herein was exercised immediately by the payment of a substantial portion of the purchase price.

Yet, while speaking in hypotheticals about considering the agreement as an option, the court, in fact, construed the transaction as a sale or, perhaps, a contract to sell which provided for installment payments. Under either view, once a significant payment was made,

> "the buyer would be bound to complete the agreement or suffer the loss of his first payment and the sellers bound to await further payment by the buyer. The rights and obligations of the respective parties had become fixed and there was a sale within the meaning of section 16(b). Citation omitted." *Id.* at 705.

*See* 2 Loss, Securities Regulation 1099 (2d ed. 1961).

The instant case is much stronger than that of Blau v. Allen. In the first place, the down payment is somewhat larger. Second, here, although not in Blau v. Allen, the final payment was made, thereby lending credence to the view that a firm sale with a delayed

payment provision was the essence of the agreement. Third, as the McDonoughs insured the success of the sale by requiring a high down payment, Smelting insured that it had the equivalent of a purchase by securing an irrevocable proxy. The resignation of Bernard P. McDonough and others as directors of Cudahy and their replacement by key Smelting officials soon after the execution of the agreement indicates that control of Cudahy passed to Smelting, that a sale, had, in effect, been accomplished.

In conclusion, that defendant McDonough is subject to the provisions of Section 16(b) has not been questioned. Adler v. Klawans, 267 F.2d 840, 845–847 (2d Cir.1959); Blau v. Allen, 163 F.Supp. 702, 704 (S.D. N.Y.1958); see 2 Loss, Securities Regulation 1060–61 (2d ed. 1961). McDonough, in fact, acknowledges that this case turns solely on whether or not the purchase and sale of the Cudahy stock by the McDonoughs occurred within a period of less than six months. (McDonough's Memorandum of Law in Support, at 8.) The resolution of that question depends on whether the sale to Smelting was consummated when the option was exercised by Smelting or when Smelting made a substantial payment to the McDonoughs, received their proxy, and effected a change in the Cudahy Board of Directors. Looking to the substance rather than to the form of the transaction, we are convinced that such an arrangement could serve as a vehicle for the unfair use of inside information leading to unfair profitable insider trading, all of which Section 16(b) was enacted to prohibit. Blau v. Lamb, 363 F.2d 507, 516, 518–519 (1966).

We conclude that transaction entered into between the McDonoughs and Smelting amounted to a sale or a contract to sell within the terms of the statute and less than six months after the purchase. Because abuses are made possible, Section 16(b) must be invoked without further inquiry and irrespective of any actual abuse. *Id.* at 516; Newmark v. R K O General, Inc., 294 F. Supp. 358, 362 (S.D. N.Y.1968). Summary judgment is granted to plaintiff and denied to defendant.