Margot NEWMARK, Plaintiff,

v.

RKO GENERAL, INC. and Frontier Airlines, Inc., Defendants.

No. 67 Civ. 4914.

United States District Court
S. D. New York.

Sept. 22, 1969.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff; Stanley L. Kaufman, Shephard S. Miller, Allan K. Peckel, New York City, of counsel.

Regan, Goldfarb, Powell & Quinn, New York City, for defendant RKO General, Inc.; John J. Galgay, Peter G. Corbett, New York City, of counsel.

Shea, Gallop, Climenko & Gould, New York City, for defendant Frontier Airlines, Inc.; Francis J. Purcell, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, a shareholder of Frontier Airlines, Inc. (Frontier), a Nevada corporation, brought this action under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover on behalf of Frontier, "short-swing" profits allegedly realized by RKO General, Inc. (RKO), an "insider" of Frontier.

In an opinion reported at 294 F.Supp. 358 (S.D.N.Y.1968), Judge Tyler held that, on the undisputed facts, plaintiff stated a claim under Section 16(b), that RKO was liable to plaintiff for the short-swing profits realized, and that the only issue for trial was the amount of the profit realized by RKO.

The issue of the amount of profit was tried before the court, without a jury.

The undisputed facts, upon which Judge Tyler found liability, are as follows:

On April 5, 1967, RKO owned 56% of the outstanding common stock of Frontier. On that date, Frontier and Central Airlines, Inc. (Central), a Nevada corporation, agreed in principle to a merger of Central into Frontier with an exchange ratio of one share of Frontier common stock for each 3½ shares of Central common stock.

In early May 1967, RKO contracted with a small number of major Central shareholders to purchase 738,251 shares of Central common stock, representing 49% of Central's outstanding shares and $500,000 principal face amount of Central convertible debentures, which were convertible into an additional 149,994 shares of Central common (hereinafter, the Central securities). The purchase of the common stock was made at the rate of $8.50 per share of common stock; the purchase of the debentures was made at the rate of $8.50 per share of the common stock into which the debentures were convertible. As a part of the purchase agreement, Central shareholders owning approximately 66% of the Central common stock promised that they would vote their shares in favor of the merger. At the time of the execution of the purchase agreement, neither the public nor the other shareholders of the two corporations had been informed of the proposed merger.

Thereafter, on May 4, 1967, Central and Frontier executed a formal agreement of merger at the previously agreed upon exchange ratio, viz., 3½ shares of Central for one share of Frontier. A press release on the merger agreement was issued that day, and the next day reports based on the release described the merger agreement and disclosed the existence of RKO's contract with the Central shareholders to purchase the Central securities.

On May 10, 1967, Frontier's Board of Directors declared a two-for-one split of Frontier common stock.

On July 27, 1967, the shareholders of Central and Frontier approved the merger and the Frontier shareholders ratified the 2–1 split of Frontier com-

mon stock, the terms of the exchange ratio being adjusted to compensate for the stock split by providing an exchange ratio of two shares of Frontier common stock for each 3½ shares of Central common stock.

On September 1, 1967, subject to certain conditions to be accepted by Frontier, the Civil Aeronautics Bòard's (CAB) approval of the merger became effective. Thereafter, on September 18, 1967, RKO received the Central securities for which it had contracted with the Central shareholders and paid a total purchase price of $7,550,082.50. On the same day, the merger agreement was filed with the Secretary of State of the State of Nevada. On September 20, 1967, the CAB received notice of Frontier's acceptance of the conditions referred to above and Frontier's request that the CAB transfer Central's certificate of public convenience to Frontier, effective October 1, 1967.

On October 1, 1967, the exchange of securities between Central and Frontier took place. In exchange for its Central securities, RKO received 421,857 shares of the new Frontier common stock and new Frontier debentures convertible into 85,714 shares of the new Frontier common stock (hereinafter, the Frontier securities).

Judge Tyler found that RKO purchased the Central securities in early May 1967; that RKO sold its Central securities when it exchanged them for the new Frontier securities on September 18, 1967, or October 1, 1967; and that RKO realized a profit by its sale of the Central securities.

Since RKO purchased the Central securities for $7,550,082.50 ($8.50 per share times 738,251 shares of common stock, and $8.50 per share times debentures convertible into 149,994 shares of common stock),[1] the measure of its profit depends on the sales price, viz., the value of the Frontier securities received in exchange for the Central securities. Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed.347 (1947); Blau v. Mission Corporation, 212 F.2d 77 (2d Cir.), cert.

---

1. RKO contends that an increment of $5.-25 must be added to the purchase price of $8.50 per share, which increment represents the difference between the sale price of Central on the date the contract to buy was exercised, September 18, 1967, and the sale price on the date the contract was executed, around May 4, 1967. However, in his opinion, Judge Tyler found uncontested the fact that the price RKO actually paid was $8.50 per share, not $13.75 per share. Furthermore, the so-called employee stock option cases, cited by RKO, are inapplicable here, since RKO did not render any services to Central during the period in question, nor was the option to buy granted so as to stimulate RKO's efforts on behalf of Central. Furthermore, RKO did not contract to buy from Central, but from individual Central shareholders. Compare Truncale v. Blumberg, 88 F.Supp. 677 (S.D.N.Y. 1950). See generally, Green and Kelly, Application of Section 16(b) to Insiders' Transactions under Employee Stock Option Plans, 17 Bus.Law. 402 (1962), reprinted in American Bar Association, Selected Articles on Federal Securities Law 667 (1968). Therefore, the court adheres to Judge Tyler's statement that "on September 18, 1967, RKO received the Central stock and convertible debentures for which it had previously contracted and paid a total purchase price of $8,550,082.50 (sic)," 294 F.Supp. 358, 360.

RKO also contends that the contract to purchase Central debentures should be excluded entirely from the computations. However, Judge Tyler held that the convertibility aspects of the transaction did not provide an exemption from liability under Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), or under Rule 16b-9, 17 C.F.R. 240.16b-9, upon which RKO relies, see 294 F.Supp. at 362, 367. See generally, Lang and Katz, Liability for "Short Swing" Trading in Corporate Reorganizations, 20 Sw.L.J. 472 (1966), reprinted in A.B.A., Selected Articles on Federal Securities Law 679 (1968). It follows from Judge Tyler's holding that the convertible debentures must be included in the computation of profit realized.

denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954).

■ Plaintiff contends that the appropriate date for determining the fair market value of the Frontier securities is September 18, 1967, when the merger agreement was filed with the Secretary of State of Nevada. Defendant argues that the appropriate date is October 2, 1967, the first market day after the securities were physically exchanged.

The date of October 1 (or October 2), 1967, has no relevance to the issue of fair market value, since the only thing which occurred at that time was the exchange of certificates, a "mechanical detail." 2 Loss, Securities Regulation 1071–2 (2d ed. 1961). Furthermore, Nevada law provides that the filing date of a merger agreement is the effective date of the merger. § 78.495, Nevada Revised statutes. Therefore, the court finds that the appropriate date for determining fair market value is September 18, 1967, when the merger agreement was filed.

Both plaintiff and defendant offered expert testimony as to fair market value on September 18, 1967.

Plaintiff's expert, Dr. Douglas Bellemore, investment analyst and a professor of finance at New York University Graduate School of Business Administration, testified that the market value of a stock is the value per share at which the stock is traded between informed buyers and sellers under no compulsion to buy or sell. Such trades occur on national stock exchanges, such as the New York or American Stock Exchanges, when there is a "good continuous market, an orderly market * * * with frequent transactions, reasonable volume * * * and not too significant spreads between the prices of the transactions."

Dr. Bellemore testified that in 1967 the market in Frontier common stock, listed on the American Stock Exchange, satisfied these conditions, and that the market price of Frontier on a given day corresponded quite closely to its market value. On Septmber 18, 1967, the average market price for Frontier was $26\frac{1}{8}$ (high: $26\frac{1}{2}$; low: $25\frac{3}{4}$). However, Dr. Bellemore testified that, in his opinion, the average market price did not represent the fair market value of the Frontier stock to RKO because of the control factor. Prior to the merger, RKO owned 56% of Frontier common stock. Had RKO not acquired the Central securities, its percentage of ownership upon the merger becoming effective would have dropped from 56% to 43%.[2] By acquiring 738,251 shares of Central which were exchanged for 421,857 Frontier shares, and debentures which became convertible into 85,714 Frontier shares, RKO was able to maintain its

2. On September 18, 1967, before the merger became effective, RKO owned 1,632,404 shares of Frontier common stock, or 56.02% of the 2,914,006 shares outstanding (after adjustment for 2–1 split). After the merger, there were to be 3,774,940 shares of Frontier common outstanding, of which RKO would own the same 1,632,404, or 43.42%.

Dr. Bellemore testified that if RKO had not acquired the Central securities and if all outstanding warrants and options on Frontier common stock were exercised (equivalent to 1.6 million shares), RKO's percentage of ownership would drop to 30% (RKO's ownership of about 1.6 million is 30% of the total of 3.7 million outstanding plus the additional 1.6 million from warrants and options). There was no testimony as to what RKO's percentage of ownership would be after the merger and after its acquisition of the Central securities if all warrants and options were exercised, but using the same figures, it appears that RKO's percentage of ownership would be 40% (RKO's ownership of 2.1 million after the merger is 40% of the total of 3.7 million outstanding and 1.6 million from options and warrants). However, this percentage is not relevant inasmuch as it is clear that RKO's object was to buy enough Central securities so that after the merger it would maintain its percentage of ownership of the outstanding common stock at 56%, without taking into consideration the options and warrants, which might in the future be exercised.

percentage of ownership of Frontier common stock at 56%.[3]

In Dr. Bellemore's opinion, the maintenance of its 56% control through the purchase of the Central securities and their exchange for Frontier securities at the time of merger was valuable to RKO, for which RKO would be willing to pay a premium above market price.

Dr. Bellemore testified that on previous occasions purchasers of the so-called "control factor" in Frontier, including RKO, had paid premiums ranging from 15% to 28% above market prices,[4] and he concluded that RKO would be willing to pay 15% above the market price on September 18, 1967, for the Frontier securities which would enable it to retain its 56% control. Using the high price of Frontier (26½), Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), and adding the premium factor of 15%, the fair market value of the block of Frontier Securities on September 18, 1967 was $15,470,764., and the realized profit to RKO on that date was $7,920,681. (or a cost of $7,550,082.).

■ RKO's expert, Edward F. Dugan, Vice-President and director of Smith, Barney & Company, investment bankers, testified that he specialized in airlines and that among the accounts he has worked on since joining Smith, Barney in 1961 was RKO's successful bid to take control of Frontier in 1964, Frontier's successful financing of a $15 million public offering of debentures with warrants in March 1967, and Frontier's $20 million offering of convertible debentures in October 1967. Dugan testified that the bulk of his work had been with small airlines, like Frontier and Central.

Dugan testified that in evaluating the value of a block of securities, such as the block of over 500,000 shares of Frontier involved here, he would consider the following ten elements: 1) the quoted market price; 2) where the stock is traded; 3) the size of the block relative to the number of shares outstanding and the trading activity in the stock; 4) whether the stock was freely tradeable or was restricted by "investment purpose" representations; 5) the identity of the seller; 6) any governmental restrictions on sale, such as the need for approval by the CAB; 7) recent price movements in the stock; 8) price-earnings (P/E) ratio of the stock relative to other stocks in the same industry; 9) the financial trend of the company; 10) the general trend in the market.

Dugan testified that in light of these factors the fair market price of the Frontier securities received by RKO on September 18, 1967 was 40% to 50% less than the market price, for the following reasons:

First, the value would be reduced by about 20% because the stock was not registered with the SEC and "therefore the buyers must give investment representations in order to buy it." Furthermore, if the stock were to be registered, the registration would have to occur at the "worst" time for Frontier, because of

3. After the merger, RKO owned its original 1,632,404 shares, plus 421,857 converted from Central common, and 85,714 converted from Central debentures, for a total of 2,139,975, out of 3,774,940 shares outstanding, or 56.69%.

4. In March 1962, the Goldfield Consolidated Mines Company (later changed to The Goldfield Company) purchased from the Maytag family 625,046 shares of Frontier common, or 66.3%, for "investment purposes" at an average price of $4.80 per share, while the market price was 3¾ bid, 3⅞ asked, which price indicates a premium of approximately 26%.

In November 1964, RKO purchased from Goldfield 651,308 shares of Frontier common, or 54.1%, for "investment purposes" at a price of $10 per share, which was $1.375 above market price, or a premium of 15%.

In December 1964, RKO purchased 16,341 shares of Frontier common from Frontier at $10 per share. These shares had previously been held by Frontier as treasury shares and the premium paid was approximately 20%.

Frontier's pending $20 million debenture offer.

Second, the value would be reduced by an additional 10% to 20% because RKO, the parent company, was the seller, and this might be construed in the market as the first step in a sell-out by RKO.

Third, the value would be reduced another 10% because Frontier common stock was selling at a P/E ratio of 80 times earnings and the company's immediate financial picture was not good, with earnings considerably lower than the year before.

Finally, even if the prospective purchaser knew that RKO would not continue to sell, the purchaser would know that he was in a permanent minority position with RKO holding 43% of the stock. Dugan testified that if it was made clear that RKO was not "bailing out," the discount from market price would still be about 33⅓%.

Dugan calculated that with a 50% discount from the high market price on September 18, 1967, the value of the block of Frontier securities was $6,725,315.75, or $824,766.75 less than the purchase price of $7,550,082.50. Thus, RKO had realized no profit.

RKO's computations indicate a realized profit of $520,296.40 using a 40% discount factor, and a realized profit of $1,417,005.16 using a 33⅓% discount factor.

On rebuttal, Dr. Bellemore disputed Mr. Dugan's analysis of Frontier's P/E ratio and testified that the American Stock Exchange's ability to handle exchange and secondary distributions would enable it to handle a block of this size at or about the prevailing market price.

On the basis of the testimony, the court does not find that a discount factor should be applied to the market price of Frontier stock on September 18, 1967.

Dugan was not testifying from the point of view of market value, which is the test under Section 16(b), Blau v. Mission Corp., *supra*; Stella v. Graham-Paige Motors Corp., 259 F.2d 476 (2d Cir. 1958), but from "investment value," which is more subjective, and more susceptible to individual variations because of an emphasis on one factor rather than another.[5] Section 16(b) is concerned with as objective a valuation as possible, which is generally determined by the market value. Blau v. Mission Corporation, *supra*. Moreover, Dugan gave no weight to the previous history of sales of large control blocks of Frontier securities at prices above, not below, the market; see footnote 4, *supra*.

■ The sole remaining question is whether a premium for control should be added to the market price, which depends on whether the stock was worth more to RKO than the market price, to enable it to retain 56% control following the merger. Whether a premium should be added to market price to determine realized profit under Section 16(b) was considered in Fistel v. Christman, 135 F. Supp. 830, 832 (S.D.N.Y.1955); and Blau v. Lamb, 242 F.Supp. 151, 160–161 (S.D.N.Y.1965), aff'd in part, rev'd in part, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L. Ed.2d 542 (1967).

In *Fistel*, Judge Weinfeld valued 4217 shares of Federal Enamel stock at no less than $140 per share. There, the expert witness testified as to market prices of several arm's length transactions in the period in question. Judge Weinfeld held that "this [value of no less than $140 per share] takes into account such premium, if any, which might have been paid to secure a large and controlling block of stock of a closely-held corporation," 135 F.Supp. at 832.[6]

---

5. Plaintiff's expert, Dr. Bellemore, testified that he made an "investment value" analysis of Frontier and concluded that the investment value was very close to the market value and that no discount factor should be applied.

6. It was not necessary for Judge Weinfeld to place an exact figure on the premium factor because in the circumstances of that case, any value higher than $140 meant that no profit was realized by the short-swing sale.

In Blau v. Lamb, Judge Tyler held that a premium of $2.50 per share should be added to the book value of $6 per share of the Industries stock to reflect the added value of the stock because of the company's "recently recruited management team * * * and * * * [the] promising sales prospects * * * in the * * * industry," 242 F.Supp. at 160–161. However, Industries stock was not actively traded and there was no readily available market price from which to compute market value, as there is here.

Therefore, neither Fistel v. Christman nor Blau v. Lamb dictates that a premium should be added to market price.

Section 16(b) provides for the recovery of "any profit realized by * * * any purchase or sale * * *." In Blau v. Mission Corp., supra, the Court had to value a block of Development Corporation securities which had been issued and exchanged for a block of Tide Water securities. Prior to the transactions complained of, Mission Corporation (the insider) owned 36% of the outstanding stock of Development and the remaining 64% were publicly held. After the issuance of new stock and the exchange, Mission Corporation owned 63% of the stock of Development and the remaining 37% were publicly owned. The Court held that the value of the stock which was sold was equivalent to the value of the "consideration received," viz., the newly issued Development stock which gave Mission Corporation legal control, but that the stipulated market price of Development stock was not conclusive on market value and the court remanded for a hearing and new findings on the market value.

In Stella v. Graham-Paige Motors Corporation, supra, the Court was faced with the problem of valuing the tangible and intangible assets of an automobile manufacturer. The Court stated:

"Many factors enter into value. The weight to be given to these factors involves the business judgment of the bargaining parties. * * * The fair value of large industrial properties cannot be fixed by the estimated price which might be received on the auction block in liquidation. *The best price would undoubtedly be offered by some company which had the greatest need for the property being sold.* Only when such a purchaser were found would the seller obtain the optimum value. * * * Obviously no seller is going to become 'willing' [to sell] until he finds *the buyer who will pay the best price because of his belief that these particular assets will be peculiarly beneficial to him.*" (Emphasis added.) 259 F.2d at 478.

The block of stock here involved was "peculiarly beneficial" to RKO, who had the "greatest need" for it. Hence, the market value on September 18, 1967 is not the sole criterion. The block was worth more to RKO because it represented the difference between its maintaining its 56% control of Frontier or having its ownership reduced to 43%. Maintaining legal control of Frontier was important to RKO in preventing take-over bids by others, an increasingly common phenomenon in this day of conglomerates, and in assuring it of complete management control of Frontier.

In determining the amount of the premium over market value, the best evidence is what RKO had paid in the past to obtain and retain control of Frontier. RKO originally purchased control from Goldfield in 1964, and purchased treasury stock shortly thereafter. On those occasions, it paid a premium of 15% to 20% over the market price. It follows that the addition of a 15% premium to market price is reasonable in determining the value of the securities received by RKO under the merger.

Applying the 15% premium, the court finds that RKO sold the Central securities for $15,470,764., realizing a profit of $7,920,681. over its cost of $7,550,082.

Plaintiff applies for interest to be awarded from the date of RKO's "sale" of its Central securities. Interest should be denied in Section 16(b) cases

"when its exaction would be inequitable." Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). While RKO "contracted with a small number of major Central shareholders to purchase * * * 49% of Central's outstanding shares, plus * * * debentures * * * [when] at the time of the execution of this purchase agreement, neither the public nor the shareholders of [Central and Frontier] had been informed of the proposed merger," 294 F.Supp. at 360, in view of the fact that Frontier stock is currently quoted at around 8 compared to 26 on September 18, 1967, the court feels that the exaction of interest would be inequitable.

The Clerk is directed to enter judgment in favor of Frontier for $7,920,-681.58, and costs. Attorneys for plaintiff may apply to the court for a reasonable attorneys' fee. Since the legal issues under Section 16(b) are novel and RKO has indicated that it will appeal Judge Tyler's determination that Section 16(b) applies, execution of the judgment will be stayed pending appeal.

Settle judgment on notice.